A03A0139. IN THE INTEREST OF R. S., a child.
(578 SE2d 152)

BLACKBURN, Presiding Judge.

Appellant, the biological mother of R. S., appeals the juvenile court's termination of her parental rights, contending that the evidence was insufficient to support the termination. For the reasons set forth below, we affirm.

On appeal, we must determine

whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.

(Citations and punctuation omitted.) *In the Interest of R. N.*[1]

The record shows that R. S., who was born June 17, 1996, was placed in the temporary legal custody of the Department of Family and Children Services (DFACS) from September 1997 to June 1999, due to drug use by appellant and her husband, R. S.'s father. On December 15, 2000, R. S. was again placed in DFACS custody after appellant was arrested for DUI and child endangerment, the latter charge based on appellant's failure to restrain R. S. within a moving vehicle. Although the charges were later dropped, appellant admitted she was under the influence of Xanax and had ingested cocaine the

---

[1] *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

night before. When found in the vehicle, R. S. was extremely dirty and was playing with a lit cigarette.

Two days later, R. S. alleged to his foster mother acts of egregious sexual abuse perpetrated by his father, whom he accused of placing toothpicks in his penis and bottles in his anus. R. S. eventually repeated these and similar accusations to his second foster mother, a DFACS caseworker, and two therapists and told the therapists that his mother participated in the abuse. Based on these accusations, the court ordered the parents to undergo psychosexual testing. The parents insisted on additional independent tests that were not concluded until July 2001, and the deprivation hearing was continued at their request to allow the testing to be completed. The results were inconclusive for pedophilia in either parent, although the father was diagnosed with Anti-Social Personality Disorder and with the potential to be physically abusive. Psychological testing of R. S., however, showed conclusively that he had been sexually abused and had suffered severe emotional trauma as a result.

R. S. was adjudged deprived on August 14, 2001. In its order, the juvenile court granted DFACS's motion to forbid contact between R. S. and his parents, based on R. S.'s extreme regression following visits. Also in its order, the court noted that DFACS had timely presented a reunification case plan that the parents refused to sign. The court ordered nonreunification on November 7, 2001, noting that while appellant had signed a DFACS reunification plan, she refused to speak with DFACS about implementing it.[2] On December 6, 2001, DFACS petitioned the juvenile court for termination of parental rights. A hearing was held on March 11, 2002, and the court terminated appellant's rights in an order dated May 15, 2002.[3] It is from that order that appellant appeals, arguing that the trial court erred in finding that the deprivation suffered by R. S. is likely to continue.

> Before terminating a parent's rights, a juvenile court must employ a two-prong test. In the first prong, the court must decide whether there is "present clear and convincing evidence of parental misconduct or inability." OCGA § [15-11-94 (a)]. Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued

---

[2] The reunification plan was not included in the record before us. Also, apparently by this time the father had left appellant's home.

[3] R. S.'s father did not attend the hearing, and the disposition of his rights was deferred. He later consented to termination and is not a party to this appeal.

deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § [15-11-94 (b) (4) (A)]. . . . In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.

*In the Interest of V. S.*[4]

1. *Parental Misconduct or Inability.* Viewing the evidence most favorably to the trial court's determination, there was clear and convincing evidence of the four factors required to establish parental misconduct or inability.

(a) As to the first factor, no issue remains as to whether R. S. is deprived. Because appellant did not appeal the trial court's orders finding deprivation, that finding is established for the purposes of this appeal, and we need to consider only the remaining three criteria. See *In the Interest of V. S.*, supra at 29. Moreover, the record is replete with clear and convincing evidence that R. S. was deprived, and appellant admits she is still unable to care for him.

(b) The evidence also amply supports the juvenile court's determination that appellant's inability to adequately care for R. S. was the cause of his deprivation. The testimony is undisputed that when R. S. first entered foster care in December 2000, he was hyperactive, angry and aggressive, uncommunicative, and difficult to control. He displayed violent reactions when exposed to test stimuli with sexual content, exhibited multiple examples of adult sexual behavior, and defecated in his pants from four to eight times a day, a condition known as encopresis. Dr. Julie Medlin, the psychologist who evaluated R. S. in February 2001 and again in February 2002, testified that R. S. initially had more emotional problems than 99 percent of boys his age. R. S. expressed extreme fear of being "found" by his parents, became hysterical after his first visit with them, and has consistently said that he does not want to live with them. When asked to draw a picture of his family, R. S. depicted himself, his brother, and his parents, and then marked out his parents' faces with a black crayon. R. S. was diagnosed with Attention Deficit Hyperactive Disorder, although Dr. Medlin testified that its symptoms may have been a manifestation of emotional trauma and parental neglect. Finally, R. S. could not recognize letters or count to ten, and scored 91 on an IQ test.

On July 24, 2001, after several foster placements that were unsuccessful due to R. S.'s disruptive behavior, R. S. was placed in the home of Peggy Campbell, his current foster mother. While in

---

[4] *In the Interest of V. S.*, 230 Ga. App. 26, 27 (495 SE2d 142) (1997).

Campbell's home, R. S. improved rapidly but suffered temporary relapses of aggressive behavior and encopresis immediately following family visits with his parents and maternal grandmother. On August 14, 2001, as part of its order adjudging R. S. deprived, the juvenile court forbade contact between R. S. and his parents because of the traumatic effect the visits were having on R. S.; the court also wished to see what effect the lack of contact would have on him. By October 2001, R. S. was thriving in foster care and had only two subsequent encopresis incidents, both following a conversation with Uma Parameswarm, his caseworker, and Campbell about possibly visiting his maternal grandmother.

Dr. Medlin, Dr. Stephen Ziegler (R. S.'s psychotherapist since August 2001), Campbell, and Parameswarm all testified to the vast improvement in R. S.'s behavior and demeanor, and performance in school, characterizing him as cheerful, outgoing, and generally well adjusted. Dr. Medlin testified that R. S.'s IQ score had risen 31 points in one year, and that most of his psychological test results were now normal. Dr. Medlin opined that the positive changes in R. S.'s behavior and emotional health (which she called "dramatic," "tremendous," and "amazing") were the direct consequence of living in a stable home environment with appropriate discipline and a lack of sexual stimuli and abuse. Dr. Ziegler testified to R. S.'s "marvelous progression" from August 2001, the last month he visited his parents, to March 2002, and characterized R. S.'s anxiety and depression as being a continuing problem, but "in remission."

(c) The record also supports a finding that R. S.'s deprivation would likely continue. In determining whether conditions of deprivation are likely to continue, the court may consider the past conduct of the parent, although past deprivation without a showing of current deprivation is insufficient. *In the Interest of J. M. C.*[5] See also *In the Interest of J. O. L.*[6] (likelihood found where two-year-old child never lived in mother's home because of drug problem, and mother admitted she would be unable to care for child for at least several months). In its termination order, the juvenile court found R. S. deprived based on the statutory criteria of OCGA § 15-11-94 (b) (4) (A) (iv) and (B) (v), which the court described as "egregious conduct of the mother towards the child of a sexually cruel nature" and "neglect of the child." The court further found that "the cause of deprivation is likely to continue and is not likely to be remedied."

(i) *OCGA § 15-11-94 (b) (4) (A) (iv) (Sexual Abuse).* Evidence of past sexual abuse and appellant's past and current attitude regard-

---

[5] *In the Interest of J. M. C.*, 201 Ga. App. 173, 174 (410 SE2d 368) (1991).
[6] *In the Interest of J. O. L.*, 235 Ga. App. 856, 858 (510 SE2d 613) (1998).

ing that abuse provided sufficient evidence that the deprivation caused by the abuse was likely to continue. Although appellant steadfastly denies sexually abusing R. S., the evidence is disputed, and there is overwhelming evidence that R. S. was egregiously abused by the father while in appellant's care. This demonstrates at least an inability on the part of appellant to protect her child, which constitutes deprivation. See *In the Interest of V. M. T.*[7] Also, appellant is still married to the father, although she testified that she would divorce him if she had the money. The court noted, and the record shows, that appellant has historically been unwilling to admit the abuse occurred, let alone that she bears responsibility for it, and appears not to be prepared to deal with its impact on R. S.[8] Also at the hearing, appellant inexplicably denied any knowledge that R. S. has ever accused her of abusing him. She has accused the current foster parents and therapists of exaggerating the seriousness of R. S.'s emotional problems; at the hearing she expressed skepticism that R. S. did not want to see her, claiming that during his visits with her and her husband, R. S. said he missed them and wanted to go home with them.

The juvenile court was authorized to find a continuing lack of fitness from appellant's statements and attitude, as well as from R. S.'s extreme regression following visits with appellant. The court was also authorized to find that appellant's denial of the reality of the abuse, of her role in permitting it, and of the serious effect it had and continues to have on R. S. constitutes a continuing threat to R. S.'s welfare and demonstrates that appellant is unable to address the emotional needs of her son. A rational trier of fact could find by clear and convincing evidence that the deprivation caused by the abuse would continue so long as R. S. is in appellant's care.

(ii) *OCGA § 15-11-94 (b) (4) (B) (v) (Neglect)*. There was clear and convincing evidence that, aside from the sexual abuse, R. S. was physically, mentally, and emotionally neglected by appellant, and at least some of that neglect is likely to continue. The circumstances of appellant's arrest for DUI and child endangerment, appellant's long history of drug abuse, and R. S.'s behavioral problems, stifled intellect, fear of his parents, and disinterest in a relationship with appellant all abundantly support the court's finding of physical, emotional, and mental neglect. Appellant has been unable to establish a meaningful parent-child bond with R. S. when he is in her custody, has not now taken sufficient steps to provide an environment where such a

---

[7] *In the Interest of V. M. T.*, 243 Ga. App. 732 (534 SE2d 452) (2000).

[8] Appellant first accused R. S. of inventing "tall tales," later blamed the first foster family, and only at the termination hearing admitted it was "possible" R. S. was abused by his father, but not as R. S. described.

bond could develop, and is unlikely to be able to establish a parental bond in the foreseeable future. There was evidence that appellant has made no more than a token effort to communicate with DFACS regarding R. S.'s situation, and in fact actively avoided contact with DFACS. However, appellant herself provided the most compelling evidence that the deprivation of neglect is likely to continue. Appellant admitted that (1) she cannot currently care for R. S. because she is a "nervous wreck"; (2) she is unable to support R. S. financially;[9] and (3) she does not know when she will be emotionally and financially able to care for him. In light of the abundant evidence of past neglect coupled with appellant's ongoing emotional instability and inability to fulfill the parental role, the court was authorized to conclude that the deprivation was likely to continue.

Appellant does appear to have taken some steps to improve her life. Appellant testified that she had attended GED classes, has applied to take the GED test, and hopes to study computers and be employed within a year. Although appellant has never taken a drug test, she claims to be drug-free since December 2000, and from December 2001 to February 2002 she saw a therapist four times.[10] Appellant also testified that she has in the past attended Narcotics Anonymous meetings, although her therapist disputed this. Finally, appellant has completed a second series of parenting classes and claims to have learned from them. However, " 'the decision as to a child's future must rest on more than positive promises which are contrary to negative past [or present] fact.' " *In the Interest of D. I. W.*[11] Appellant's tentative, largely unsubstantiated steps toward rehabilitation do not compel a conclusion contrary to that reached by the juvenile court.

(d) Finally, the juvenile court's finding that R. S. would likely be harmed by the continued deprivation is clearly well founded. Dr. Medlin testified that resumed visits with appellant would likely cause R. S. to experience an increase in behavioral problems, sexual acting out, difficulties in school, and a relapse of his encopresis. She further testified that a failure to terminate appellant's parental rights, to "wait another year," would increase R. S.'s level of anxiety and inhibit his ability to form permanent emotional bonds with his foster family, and that it would probably never be in R. S.'s best inter-

---

[9] Appellant testified that she subsists entirely on a $545 per month disability check and gifts of money and food from her mother and her church.

[10] Tellingly, appellant's therapist, Alice Romanek, testified that appellant did not initially mention the sexual abuse allegations, but attributed the removal of her children entirely to her drug problem and DUI arrest. Romanek testified that the sessions focused primarily on appellant's depression over the loss of her children and her relationship with her husband.

[11] *In the Interest of D. I. W.*, 215 Ga. App. 644, 646 (451 SE2d 804) (1994).

est to return to the care of appellant. Dr. Ziegler testified that removing R. S. from his foster home and a reunion with his parents would be traumatic and currently not in his best interest, although he did not foreclose the possibility of future contact. R. S.'s own physical and emotional response to visits with appellant and the mere prospect of visiting appellant's mother provides further evidence of the harm caused by his deprivation. See *In the Interest of S. L. W.*[12] (evidence of intensification of child's behavior problems immediately after visits with parent and encounters with the court system was sufficient to satisfy the fourth criterion). When combined with appellant's history of neglect and her current and apparently future inability to be a competent parent, the record provides clear and convincing proof that continued delay will likely be harmful to R. S.

2. *Best Interest of the Child.* Finally, the juvenile court properly determined that termination of parental rights is in the best interest of R. S. "The same factors which show a parent's inability to properly care for her child may also prove that termination of her parental rights is in the best interest of that child." *In the Interest of D. A. E.*[13] R. S.'s reaction to visits with his mother, followed by his remarkable improvement since ceasing all contact with her, speaks for itself. Further, Dr. Medlin noted that R. S.'s family drawings now depict only his brother and himself, and Dr. Ziegler testified that R. S. has never mentioned his parents or his grandmother in seven months of therapy. Dr. Medlin and Dr. Ziegler both opined that R. S. has "moved on," and no longer considers his biological parents to be part of his immediate family.

Conversely, it is beyond dispute that R. S. is thriving in his foster family. Campbell, whom R. S. calls "Grandma," testified that she wants to adopt R. S., and also testified that R. S. told her he wants her to adopt him. Dr. Medlin, Dr. Ziegler, and Parameswarm all testified that R. S. has told them at various times that he wants to live with Campbell and not his parents. Several witnesses testified to the bonding that has occurred between R. S. and his foster mother, including spontaneous displays of mutual affection observed firsthand. Finally, the guardian ad litem argued that it is in the best interest of R. S.'s continued recovery for appellant's parental rights to be terminated, noting that only two weeks before the hearing, R. S. told him he did not want to see his mother.

R. S. has clearly been abused and neglected in the past, and appellant is at least partly responsible for that deprivation. Sufficient evidence was presented that appellant is currently unable to

---

[12] *In the Interest of S. L. W.*, 221 Ga. App. 509, 512 (471 SE2d 579) (1996) (overruled for other reasons).

[13] *In the Interest of D. A. E.*, 251 Ga. App. 232, 234 (554 SE2d 228) (2001).

parent R. S., and that her prognosis is at best questionable. The court did not abuse its discretion in finding parental misconduct or inability by clear and convincing evidence, and that termination is in R. S.'s best interest.

*Judgment affirmed. Ellington and Phipps, JJ., concur.*

DECIDED FEBRUARY 6, 2003.

*Ann C. Stahl,* for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General, Neel & Smith, Barry S. Haney,* for appellee.