A96A2088. IN THE INTEREST OF R. N. et al., children.
(480 SE2d 243)

BLACKBURN, Judge.

The mother of these five children appeals the juvenile court's termination of her parental rights, claiming the evidence is insufficient to support the court's judgments.[1] The question on appeal is whether, after reviewing the evidence in a light most favorable to the lower court's judgments, "any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." (Citations and punctuation omitted.) *In the Interest of J. H.*, 210 Ga. App. 255, 258 (1) (435 SE2d 753) (1993). This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met. *In the Interest of J. M. K.*, 189 Ga. App. 140, 141 (375 SE2d 131) (1988).

Pursuant to OCGA § 15-11-81 (a), a juvenile court deciding whether to terminate a parent's rights employs a two-prong test, first determining whether there is "clear and convincing evidence of parental misconduct or inability." For purposes of this case, a finding of "parental misconduct or inability" must rest on clear and convincing evidence showing: 1) that the child is deprived; 2) that the cause of the deprivation is a lack of proper parental care or control; 3) that the cause of the deprivation is likely to continue or will not likely be remedied; and 4) that the continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A). If the first prong of the test is met, the trial court then considers whether the termination of parental rights is in the child's best interests.

At the time the mother's rights were terminated on August 10, 1995, these children ranged in age from four to ten years. The evidence showed the mother had demonstrated a continuing pattern of conduct that required the Chatham County Department of Family & Children Services (DFACS) to remove the children on a number of different occasions prior to the termination. In early 1989, the juvenile court declared the three oldest children deprived after Chatham County police found them living in a trailer with "maggots on the

---

[1] The father's rights were also terminated, but he has not appealed.

stove and trash everywhere," which the court described as "unfit for human habitation." The children's hair was infested with lice, and the utilities were being cut off for nonpayment. DFACS placed the children in foster care and worked with the parents. By March 1990, the parents had made sufficient improvements, and the court returned the children to their custody.

By 1992, however, the size of the family had grown from three children to five, and problems were again evident. The mother was hospitalized in December 1992 for depression, and the oldest two children were not enrolled in school until December 2, 1992. Between that date and January 23, 1993, these two children missed twelve of twenty-five school days and were tardy an additional five. In early 1993, eviction proceedings had been instituted against the parents, and the utilities had been cut off in their apartment. The home was strewn with food and clothes. In January 1993, one child burned himself on a space heater. The court entered another order reciting these facts and finding the children deprived. The parents stipulated to this order.

Once again, the parents improved their situation to the point that they were allowed physical (but not legal) custody of two of the children, and later four. As part of a reunification plan, the court later ordered the parents to "provide a stable, adequate, and safe residence" for these children. But after the children were returned to their parents, the problems recurred. A DFACS caseworker testified that even though social workers assisted at the mother's home once or twice a day, the children still were not getting to school, and they continued to have problems with lice. Utilities had been cut off, and "all the problems that had occurred prior to the kids being placed [with DFACS] were back." In May 1994, the mother admitted herself to a mental health "crisis stabilization unit." DFACS again assumed custody of the children. Throughout the remainder of 1994 and into 1995, the mother made some effort to comply with required counseling, even though the parents separated, moved, then got back together. The petition for termination of parental rights was filed on April 24, 1995.

1. (a) Based on the above facts, the juvenile court did not err in finding the children deprived, the first prong of the test under OCGA § 15-11-81 (a). At the time of the hearing, the parties were operating under a stipulated 1993 order which had found the children to be deprived. See *In the Interest of B. P.*, 207 Ga. App. 242, 244 (427 SE2d 593) (1993) (unappealed order finding deprivation establishes deprivation for purposes of later termination proceedings). Furthermore, the evidence showed that when the mother had custody of the children, they suffered from lice infestations, did not attend school, and lived in squalid, unstable conditions. See *J. M. K.*, supra at 141

(inability of parent to provide adequate food, shelter, and supervision). This evidence sufficiently supports the juvenile court's finding that these children were "deprived" as defined by OCGA § 15-11-2 (8) (A). See *In the Interest of C. N. G.*, 204 Ga. App. 239 (1) (419 SE2d 42) (1992) (juvenile court has discretion in determining whether child is "deprived" which, if based on evidence, is not subject to the control of a reviewing court).

(b) The trial court was also entitled to determine that the mother's inability to adequately care for the children was the cause of the children's deprivation. OCGA § 15-11-81 (b) (4) (A) (ii). A psychologist testified that, when he examined the mother in 1993, he found her to suffer from major depression, post-traumatic stress disorder, and a personality disorder. The mother had been hospitalized twice for depression and admitted that when the children were last taken from her custody in 1994, she was in a state of "depression and chaos." The juvenile court properly considered this mental illness in determining whether the mother could adequately provide for her children's needs. OCGA § 15-11-81 (b) (4) (B) (i). The pattern of conduct since 1989 supplies a clear and convincing basis for the juvenile court's finding that the children's deprivation was due to their mother's inability to care for them. See *In the Interest of R. L. M.*, 221 Ga. App. 343, 344 (1) (471 SE2d 245) (1996) (mother's mental condition rendered her incapable of caring for her children).

(c) The evidence also sufficiently supported the juvenile court's finding that this deprivation is likely to continue in the future. OCGA § 15-11-81 (b) (4) (A) (iii). "Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." (Punctuation omitted.) *In the Interest of A. M. B.*, 219 Ga. App. 133, 134 (464 SE2d 253) (1995). The court was entitled to infer from the evidence that, despite the best efforts of DFACS and many other social workers and charities, the same pattern of deprivation would continue each time the children were reunited with their mother. See *R. L. M.*, supra. Furthermore, the psychologist predicted that the mother's pattern of stabilizing the household when the children were away but then becoming overwhelmed and incapable of meeting their needs when they were returned to her custody would likely repeat itself. See *A. M. B.*, supra at 134-135.

(d) The record also sufficiently supports the fourth necessary finding, that the children are likely to be harmed by the lack of proper parental care and control. OCGA § 15-11-81 (b) (4) (A) (iv). A psychologist who had evaluated the four older children in 1993 testified that all four had varying degrees of emotional disorders and speech impediments and lagged well behind other children in devel-

opment. This evidence, combined with the evidence showing the children's dire living conditions in 1994, provides clear and convincing support for the juvenile court's finding of likely harm. See *A. M. B.*, supra at 135.

2. In determining that terminating the mother's parental rights would serve the best interests of the children, the court properly concerned itself with the need for stability in their lives. These children had been bounced between foster homes and their parents' home over the previous several years, to the detriment of their emotional stability. See *In the Interest of D. I. W.*, 215 Ga. App. 644, 646 (451 SE2d 804) (1994). Furthermore, the same factors which show parental inability may also show that termination would be in the children's best interest. *In the Interest of G. K. J.*, 187 Ga. App. 443, 444 (2) (370 SE2d 490) (1988). Although the mother contends she has now changed, judging the credibility of her good intentions was a task for the juvenile court. "[T]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and punctuation omitted.) *D. I. W.*, supra at 646.

The evidence sufficiently supports the trial court's judgments terminating the parental rights of the mother to these five children.

*Judgment affirmed. Birdsong, P. J., and Beasley, J., concur.*

DECIDED JANUARY 7, 1997.

*Darden & Moyers, Richard M. Darden*, for appellant.

*Michael J. Bowers, Attorney General, Shalen A. Sgrosso, Assistant Attorney General*, for appellee.