555 S.E.2d 81 (2001)
251 Ga. App. 708
In the Interest of C.F. et al., children.
No. A01A2082.
Court of Appeals of Georgia.
October 3, 2001.
*82 Culp & Smith, John C. Culp, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant General, Shalen S. Nelson, Assistant Attorney General, Sanders B. Deen, for appellee.
ELDRIDGE, Judge.
The father of C.F. and K.F. appeals from the December 8, 2000 order of the Juvenile Court of Cobb County terminating his parental rights[1] contending that such order was not supported by clear and convincing proof. Finding no error, we affirm.
"On appeal, we must view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated. We do not weigh the evidence and must defer to the trial judge as the factfinder." (Citations and punctuation omitted.) In the Interest of K.A. C., 229 Ga.App. 254, 255, 493 S.E.2d 645 (1997).
Viewed in this light, the record shows that on November 21, 1997, the children were taken into custody by the Marietta Police due to the mother's abuse of cocaine and the father's inability to provide for the children because he was homeless and unemployed. At such time, C.F., a male, was seven years old, and K.F., a female, was three. The children were placed with a maternal aunt. Deprivation proceedings were commenced by the Department of Family & Children Services ("DFCS"). On January 13, 1998, the juvenile court found that the children were deprived due to the mother's abuse of cocaine, the father's inability to provide for the children, the parents having been taken into custody by the Cobb County Sheriff's Office on outstanding warrants, and the mother's assertions that the father also abused drugs and had physically abused her. At the termination proceedings, both parents admitted to drug and alcohol abuse during the time period prior to the children's removal. Temporary *83 custody of the children was continued in the maternal aunt. The parents were ordered to complete drug and alcohol assessments and any recommended therapy.
On April 20, 1998, another hearing was held because the maternal aunt, due to health problems, could no longer care for the children. At such time, the parents' whereabouts were unknown. The children were placed with their maternal great-grandmother. In addition to drug and alcohol assessments and therapy, the parents were ordered to establish stable housing and employment.
On September 16, 1998, the mother was incarcerated for violation of felony probation and sentenced to serve four months. In October 1998, the father entered Victory House, a faith-based housing, work, and drug treatment program. On December 11, 1998, an order was entered allowing the father to have supervised visitation with the children at the Acworth Police Department. On March 1, 1999, the father was ordered to pay $112.50 instanter for child support and on the nineteenth day of each month to pay an additional sum of $100. The $112.50 was paid by Victory House. Between March 1, 1999, and November 8, 2000, the date of the termination proceeding, the father paid only $200-$250 toward his child support obligation.
Custody of the children continued in the great-grandmother. By August 19, 1999, the juvenile court was unable to determine where the mother was living. The father remained at Victory House. The great-grandmother had reported that C.F. was sexually and physically abusing his younger sister K.F. The children were separated, and C.F. was placed in foster care. K.F. remained with her great-grandmother. The whereabouts of the mother continued to be unknown until January 9, 2000, when she was re-incarcerated for a felony probation violation. The mother testified that during such time period she was hiding to avoid arrest on the outstanding warrant. On February 1, 2000, the mother was sentenced to serve eighteen months of a five-year sentence.
Julie Medlin, Ph.D., a licensed psychologist, testified that she conducted court-ordered psychosexual evaluations of both children. During such evaluations, C.F. admitted sexually touching K.F. many times. C.F. stated that he had seen his parents having sex and had viewed pornographic movies and magazines. C.F. also indicated that K.F. had been sexually abused by the father. C.F. further stated that "his father may have touched him sexually when he was a baby." When Dr. Medlin prompted C.F. for more information, C.F. retracted this statement. However, later in the evaluation he said, "I think Dad did sexually abuse me."
Dr. Medlin testified that K.F. reported that she had been sexually abused by both her father and C.F. K.F. however refused to elaborate on the sexual abuse by her father because "her great-grandmother would whup her." Based on Dr. Medlin's evaluation, on August 4, 2000, K.F. was removed from the great-grandmother's home and her father's visitation was suspended. Dr. Medlin further testified that a psychosexual evaluation was ordered on the father. While the father came to her facility on July 13, 2000, and completed a portion of the test, he did not return for the remainder of the test despite several telephone calls to him to do so.
Virginia Goldstein, a licensed social worker testified that starting in March of 1999, she provided weekly in-home counseling to the children. During these counseling sessions, K.F. often focused on domestic violence and abuse and worried about not being able to protect her mother from abuse by the father. At the termination hearing, both parents admitted domestic violence had occurred while they were living together. The mother testified that she had initially moved to Georgia with the two children because of the mental, verbal, and physical abuse directed at her by the father. K.F. also reported to Goldstein that she had observed her parents having sex. K.F. additionally stated to Goldstein that her father had stripped her of her clothing and stared at her and that, when she was in the bathroom while her father bathed, she rubbed her fathers back, buttocks, and "front privates." K.F. also told Goldstein that she had been sexually abused by C.F. C.F. also reported to Goldstein that he had observed sexual acts between his parents and that he *84 had viewed sexual materials (a magazine and a movie) while visiting relatives in New York. C.F. admitted to Goldstein that he had been involved in sexual behavior with K.F.
K.F.'s current foster mother testified that K.F. had been living in her home since the end of July 2000. The foster mother testified that about three weeks after K.F.'s arrival, she once observed K.F. engaged in inappropriate sexual behavior with another female foster child placed in her home. In addition the foster mother testified that, when K.F. first began residing in her home, she was prone to temper tantrums, had problems in school, and needed a lot of attention, but that K.F.'s attitude and school performance had improved recently. Jennifer Hagood, K.F.'s kindergarten teacher, also testified that K.F. had temper tantrums and that K.F. would curl up on the floor in a ball and scream, which was completely out of the norm.
Rebecca Eads, a DFCS caseworker, testified that the children's mother told her that K.F. had walked into the room while she and the father were having sex and that the father refused to stop and stated "that was how his children should learn." Eads testified that the mother denied that C.F. had ever been in the room when they were having sex, but stated that C.F. had been exposed to "sexual videos" when he was at a friend's house. At trial, both the mother and the father admitted that one or both of the children had walked in the room when they were having sex, but stated that the children were told to leave the room.
The children's maternal great-grandmother testified that, while the children were living with her, K.F. told her that her father undressed her and stood her on the coffee table and looked at her, and that when her father took a shower, he took her into the bathroom with him. The great-grandmother also testified that, when K.F. came to live with her, K.F.'s two front teeth were jagged and cracked requiring their removal, and that K.F. told her that they were broken when K.F.'s father knocked K.F. down the steps.
At the time of the termination proceedings, the father was living and working at Victory House. While there was testimony that he had completed Victory House's drug program approximately one year earlier, the program was not run by certified counselors, let alone certified substance abuse counselors. Further, the father had not been given any drug screening tests by Victory House. While the father possessed marketable computer skills, he elected to remain at Victory House in an essentially unpaid position. The only housing he had was an on-site house provided by Victory House. Held:
The evidence presented amply supports the juvenile court's decision to terminate the father's parental rights to C.F. and K.F.
The termination of parental rights under OCGA § 15-11-94 involves a two-step analysis.
First, the juvenile court must determine whether there is [present] clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-94(b). Parental misconduct is found when the child is deprived, the cause of deprivation is lack of proper parental care or control, the cause of the deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child.[2] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, it must consider whether the termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[3]
In the Interest of J.J.W., 247 Ga.App. 804, 545 S.E.2d 21 (2001).
1. (a) As the father "did not appeal the original order of the juvenile court finding that his children were deprived, he cannot now complain about that finding." (Citations and punctuation omitted.) In the *85 Interest of N.J.W., 233 Ga.App. 130, 133(1)(a), 503 S.E.2d 366 (1998). Such unappealed deprivation order establishes that C.F. and K.F. are deprived within the meaning of OCGA § 15-11-94(b)(4)(A)(i). See In the Interest of A.W., 240 Ga.App. 259, 262, 523 S.E.2d 88 (1999).
(b) Further, the juvenile court had sufficient evidence to determine that the father's inability to adequately care for his children was the cause of the children's deprivation. It is well established that lack of proper care may be established by showing, "past physical, mental, or emotional neglect of the child or of another child by the parent." (Citation and punctuation omitted.) In the Interest of M.L.P., 236 Ga.App. 504, 506(1)(b), 512 S.E.2d 652 (1999); OCGA § 15-11-94(b)(4)(B)(v).
[W]here the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.
OCGA § 15-11-94(b)(4)(C).
In this case, C.F. and K.F. were subjected to sexual abuse, inappropriate sexual activity and materials, domestic violence, and substance abuse while living with the father. Further, the evidence shows that the father has failed to support his children. When the children were originally taken into custody, the father was both jobless and homeless. Since the father moved to Georgia, he has not had permanent employment, but has worked temporary jobs which he would quite because of depression. Since the children came into DFCS's custody, the father has paid only $200 to $250 in child support. At the time of the termination proceedings, the father still did not have stable housing. He continued to live and work at Victory House, even though he had graduated from that program. For the past three or four months he had resided in a house owned by Victory House, which was near their other facilities. The father testified that Victory House paid him $450 bi-weekly, but he did not receive any of the money because Victory House retained it for providing him room, board, and legal expenses. The father further testified that he had no current plans to leave Victory House to seek employment elsewhere. Further, the father admitted at trial that the environment he was living in was not appropriate for a female child and that he was in no position to care for K.F. The father also testified that he felt it would be in K.F.'s best interest to remain in her current foster home. In addition to not completing the court-ordered psychosexual evaluation, the father also admitted that he had failed to submit to regular, random drug testing, and that Victory House had not performed any drug screening since he had been in their program.
In addition, the evidence shows that the father did not attempt to legitimate the children until the same week DFCS commenced termination proceedings against him. Moreover, K.F.'s foster mother, and Misti Pope, the DFCS caseworker currently assigned to the children and who supervised their recent visitation with their parents, testified that neither of the children appeared to have any significant bond with their father. The great-grandmother testified that the behavior of both children was worse after visits with their father. Such evidence provides a clear and convincing basis for the finding that C.F.'s and K.F.'s deprivation was caused by their father's inability to care for them.
(c) The evidence also supports the finding by the juvenile judge that the deprivation is likely to continue. "Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." (Citation and punctuation omitted.) In the Interest of V.S., 230 Ga.App. 26, 29(1), 495 S.E.2d 142 *86 (1997). The court was entitled to infer from the evidence that the same pattern of deprivation would continue if C.F. and K.F. were reunited with their father.
The father failed to complete the court-ordered psychosexual evaluation. Even though the father had completed Victory House's program a year earlier, the program was not run by certified counselors, let alone certified substance abuse counselors. Further, the father has no plans to leave Victory House, and he does not receive any actual money from Victory House for his employment there. The father further testified that he has no savings or any way to support the children or pay child support absent Victory House's continued support, and that the only way he can pay child support is through conducting a special "fund raising" for such purpose. While the father testified that he might be able to start some type of business in about six months, it is well established that "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citations and punctuation omitted.) In the Interest of M.L.P., supra at 509(1)(c), 512 S.E.2d 652.
(d) We also find clear and convincing evidence that the children are likely to be seriously harmed by the continued deprivation.
Both Dr. Medlin and Goldstein have diagnosed both children with psychological disorders and problems, which were evidenced in their behavior about which Hagood, K.F.'s foster mother, and the great-grandmother testified. Further, the father has interfered with the children's psychological counseling by telling them not to talk to the various therapists. Further, C.F. stated to Goldstein that if his father abused him in the future, he would not report the abuse.
2. Finally, "[i]n determining that [termination of] the [father's] parental rights would serve the best interests of the children, the court properly concerned itself with the need for stability in [the children's] lives." In the Interest of R.N., 224 Ga.App. 202, 205(2), 480 S.E.2d 243 (1997). At the time of the termination hearing, both children had been in the custody of DFCS for almost three years. The father testified that he still was not ready to assume the care of K.F. and felt it was appropriate for her to remain in foster care. While the father testified that he felt he was ready to assume the custody and care of C.F., he still did not have a paying job or housing outside the on-site housing provided by Victory House. K.F. is doing well in her current foster home, and her foster mother testified that she was interested in adopting K.F. Further, "[t]he same factors which prove a parent's inability to properly raise [his] children may also serve to show that termination of parental rights would be in the children's best interests. [Cit.]" In the Interest of V.S., supra at 30(1). Thus, there was clear and convincing evidence that termination of the father's parental rights was in C.F.'s and K.F.'s best interests.
Judgment affirmed.
ANDREWS, P.J., and MILLER, J., concur.
NOTES
[1] The mother's parental rights to C.F. and K.F. were also terminated. However, the mother is not a party to this appeal.
[2] OCGA § 15-11-94(b)(4)(A).
[3] OCGA § 15-11-94(a); In the Interest of B.D., 236 Ga.App. 119, 511 S.E.2d 229 (1999).