A03A0953. IN THE INTEREST OF A. L. S. S., a child.
(590 SE2d 763)

MIKELL, Judge.

B. J., the putative father of A. L. S. S., appeals the Tattnall County Juvenile Court's order terminating his parental rights and awarding custody to the Tattnall County Department of Family and Children Services ("DFCS"). We affirm.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[1] "We do not weigh the evidence and must defer to the trial judge as the factfinder."[2] So viewed, the evidence shows that A. L. S. S. was born on November 14, 1999, and placed in the custody of DFCS in state-approved foster care two days later, after she tested positive for cocaine. A. L. S. S.'s biological mother, who also tested positive for cocaine at that time, named B. J. as the child's father. On the day after A. L. S. S.'s birth, B. J. was arrested on a prior warrant for sale of cocaine and was incarcerated.

DFCS filed a deprivation petition, which the court heard on March 1, 2000. The court granted the petition, concluding that A. L. S. S. was deprived and that it was in her best interest to remain in the temporary custody of DFCS.[3] B. J., who was incarcerated when the hearing occurred but was represented by counsel, agreed that DFCS should have temporary custody of A. L. S. S. for 12 months. In its order, the court approved a reunification case plan, which set forth the following goals for B. J.: (1) maintain meaningful contact with A. L. S. S. by visiting her once a month and contacting DFCS if he could not make the visit; (2) provide financial support; (3) legitimate A. L. S. S.; (4) provide a safe, secure, permanent, nurturing home; and (5) cooperate with DFCS to complete the case goals. The order was not appealed.

In May 2000, DFCS filed a motion, requesting the nonreunification of A. L. S. S. with her parents. The court granted the motion as to the mother, but it ordered DFCS to continue to reunite A. L. S. S. with B. J. B. J. was released from prison on December 7, 2000. DFCS again moved to discontinue its efforts to reunite A. L. S. S. with B. J. On May 29, 2001, the court denied the request and gave B. J. four months to complete a case plan for reunification. On June 20, 2001, however, B. J. agreed to change the permanency plan to a nonreunification plan. On December 3, 2001, the court entered a supplemental order, incorporating the nonreunification plan.

On January 14, 2002, the court entered another order finding that A. L. S. S. was deprived and awarding DFCS temporary custody of A. L. S. S. for 12 additional months. DFCS then filed a petition to

---

[1] (Citation omitted.) *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001).

[2] (Citation and punctuation omitted.) *In the Interest of C. F.*, 251 Ga. App. 708 (555 SE2d 81) (2001).

[3] In the order granting the petition, the court noted that A. L. S. S.'s mother had contacted DFCS once since the child was placed in its care to advise that she was out of the country. The mother's parental rights were later terminated on May 17, 2002.

terminate the parental rights of the child's mother, putative father, and any person who may be the child's biological father. The court entered an order terminating the parental rights of the mother and any unknown biological father on May 22, 2002. After a hearing on June 27, 2002, B. J.'s parental rights were terminated.

During the hearing, five witnesses, including B. J., testified. Jennifer Conner, a former DFCS case manager, testified that she worked on the case from its inception until January 11, 2001, when she transferred the case to another case manager, Jimmy Brantley. Conner first met with B. J. in the Bryan County Jail to discuss the reunification case plan with him. B. J. told Conner that he would be released in April 2000 and that he would begin the case plan at that time, but he remained incarcerated until December 2000. During that year, he did not contribute financially to A. L. S. S.'s support or legitimate her. Conner testified that she sent B. J. notice of the case panel reviews and that he called her to discuss the new case plans, but she had no other in-person contact with him. Once B. J. was released from prison, Conner scheduled a visit for him to meet with A. L. S. S. on January 9, 2001, but he did not make that visit. She scheduled another during the next two weeks that he did attend, but by that time, the case had been transferred to her co-worker, Brantley.

Brantley testified that he first met with B. J. during that January 22 visit; that B. J. arrived 15 minutes late; that A. L. S. S., who was 14 months old at the time, cried each time B. J. tried to hold her or talk to her; that A. L. S. S. would not go to B. J. but sat on her foster parent's lap during the entire visit; and that he and B. J. went over the case plan after the visit.

Brantley testified that because there was no bond between A. L. S. S. and B. J., he suggested a weekly visitation schedule, to which B. J. agreed. B. J. was 20 minutes late for the next visit on January 29, 2001, but arrived with some candy and a doll for the child. Again, A. L. S. S. would not go to him and remained with her foster parent during the entire visit. B. J. told Brantley that he was working at a poultry plant and asked about parenting classes. Because the county's parenting classes had already begun, Brantley arranged one-on-one parenting classes for B. J. with a parent aide at the expense of DFCS. B. J. cancelled the next visit ten minutes before it was scheduled to begin, claiming that he was sick, the following visit because he had no transportation, and the next scheduled visit because he had to go to the unemployment office. When Brantley asked B. J. why he needed to go to the unemployment office, B. J. indicated that he had quit working at the poultry plant because it was too cold. Brantley testified that during that phone call, B. J. inquired about A. L. S. S., which he had not done on previous calls to

cancel visits. After two more missed visits, Brantley reminded B. J. that he had only four months to comply with the case plan and that if he did not attempt to do so, Brantley would recommend that his parental rights to A. L. S. S. be terminated.

Brantley could not recall that B. J. visited A. L. S. S. again after January 29 but admitted, on cross-examination, that there may have been one other visit. Brantley also admitted that he offered B. J. the option of voluntarily surrendering his parental rights, as he does with every parent whose child has been in foster care for over a year, but testified that he did not think that those conversations affected B. J.'s ability to meet his case plan goals or to visit A. L. S. S.

Brantley testified that B. J. did not provide any financial support for A. L. S. S. B. J. did not attend any of the parenting classes, which were scheduled from 8:00 a.m. to 10:00 a.m. on the Mondays that he was scheduled to visit the child, beginning on February 5. During the time that B. J. was out of prison, he lived with his mother. B. J. returned to prison in April 2001 and remains incarcerated. Once the plan changed from unification to nonreunification in June 2001, B. J. was still expected to maintain contact and provide the child with some financial support, neither of which he did.

Brantley opined that the termination of B. J.'s parental rights was in the child's best interest. He explained that A. L. S. S. had been in DFCS's custody for nearly two and a half years and had been with the same foster parents during that time; that she was "a fine, healthy, happy little girl"; that she referred to her foster parents as "mommy" and "dada"; and that her foster parents wanted to adopt her.

B. J. testified that he believed he was A. L. S. S.'s biological father; that he and the child's mother sold cocaine during the time that the mother was pregnant, but he did not know that she was using cocaine; that he was serving a twelve-year sentence on two 2001 convictions for selling cocaine; that the charges stemmed from incidents that occurred before A. L. S. S.'s birth; that in 1995 he pled guilty to a felony charge of possession of a firearm by a convicted felon and a misdemeanor charge of improper lane usage and was sentenced to two years in prison on those charges; that at the time he entered the 1995 plea he was on probation for a burglary conviction; that he had been given a possible parole date of June 2004, but his sentence would not be completed until 2013; and that he had been out of jail for three to four months during the child's life and had visited her six times during that time.

Regarding his case plan goals, B. J. testified that he understood the goals. B. J. explained that he filed a legitimation petition but admitted that it was dismissed because he did not remain in contact with his attorney. B. J. testified that he did not financially support

A. L. S. S.; that he did not take the parenting classes; that he missed visits with A. L. S. S. because he did not have a valid driver's license, and he could not get anyone to take him to the DFCS office; that he had not visited A. L. S. S. in over a year; that he did not ask Brantley about assisting him with transportation; and that he did not ever think to buy anything for A. L. S. S. or contribute to her support with the money he received from family members while he was incarcerated. B. J. did not pay for A. L. S. S.'s mother's medical expenses while she was pregnant with A. L. S. S. Despite the foregoing, however, B. J. testified that he thought he deserved a third chance to reunite with his daughter and that he wanted her to live with his sister, Lavone Jackson, until his release.

Carol Miller, who was appointed as A. L. S. S.'s guardian ad litem and attorney, stated that despite B. J.'s inability to meet the case plan goals, she did not believe that B. J. had abandoned A. L. S. S. Nonetheless, Miller agreed that it would be in the child's best interest that B. J.'s parental rights be terminated. She also stated that her recommendation was based almost completely on the fact that B. J. had been in prison and would continue to be imprisoned for the next two years. The court terminated B. J.'s parental rights and denied his second legitimation petition.

1. Before terminating parental rights, a juvenile court must employ a two-prong test.[4] First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[5] "In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child."[6] As to the first prong, B. J. disputes only the trial court's findings as to the third and fourth factors. B. J. argues that his incarceration, alone, cannot serve as the basis for the trial court's finding that the deprivation was likely to continue or would not likely be remedied because his incarceration resulted from crimes committed before A. L. S. S.'s birth and because he tried to meet his case plan goals when he was out of prison. B. J.'s arguments lack merit.

Though "[a] parent's incarceration does not always compel the ter-

---

[4] OCGA § 15-11-94 (a); *In the Interest of C. F.*, supra at 711.

[5] OCGA § 15-11-94 (b) (4) (A) (i)-(iv); *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

[6] (Citation omitted.) *In the Interest of S. B.*, 237 Ga. App. 692, 693 (515 SE2d 209) (1999). Accord *In the Interest of R. N.*, supra.

mination of parental rights, . . . it can support a termination when there are sufficient aggravating circumstances present."[7] The failure to comply with goals in the case reunification plan is considered to be such an aggravating factor.[8] During the three to four months of A. L. S. S.'s life that B. J. was not incarcerated, he was given the opportunity to visit with A. L. S. S. every week beginning in January 2001, but he only visited with her four times, according to Brantley. He was imprisoned again in April 2001 but had stopped visiting with the child before then. He did not maintain employment and provided no financial support or a stable environment for the child. B. J. testified that even though he received money from his family while in prison, it simply did not occur to him to send anything to A. L. S. S. He failed to attend the parenting courses scheduled for him. He did not pay for any of the child's medical care or her mother's medical care while she was pregnant with A. L. S. S. A "criminal conviction, [along with] near continuous incarceration during the child's life, and [the] failure to comply with reunification case plans both before and during his incarceration provide[ ] ample grounds for [the] termination of . . . parental rights."[9] Accordingly, the evidence in the record supports the court's finding that A. L. S. S.'s deprivation would continue.

The record supports the trial court's finding, by clear and convincing evidence, that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to A. L. S. S.[10] The evidence showed that this child had been in foster care for all but two days of her life. The caseworker testified that foster care is very traumatic on a child and that A. L. S. S. would never have the assurance of a permanent home as long as she remains in foster care. Additionally, we must also consider that B. J. never established a parental bond with A. L. S. S., that his current incarceration prevents him from doing so now, and that A. L. S. S. has established a parental bond with her foster parents.[11] Although "DFCS is obligated to pursue alternatives to termination, which it did in this case, . . . it is not obligated to gamble the child's prospects for a good life on the possibility that [B. J.] will emerge from prison in [two to eleven]

---

[7] (Footnote omitted.) *In the Interest of M. C. L.*, 251 Ga. App. 132, 134 (1) (553 SE2d 647) (2001); *In the Interest of A. T. H.*, 248 Ga. App. 570, 572 (1) (547 SE2d 299) (2001).

[8] *In the Interest of M. C. L.*, supra at 135 (1). See *In the Interest of K. B.*, 252 Ga. App. 808, 809-810 (556 SE2d 922) (2001) (failure to provide parental care and support considered an aggravating circumstance); *In the Interest of A. T. H.*, supra at 572 (1) (aggravating circumstances found where a parent has not visited regularly with the child or established a parental bond and has no present prospects for employment as required by case plan).

[9] (Footnote omitted.) *In the Interest of A. R. G. B.*, 251 Ga. App. 673, 674 (4) (555 SE2d 42) (2001).

[10] OCGA § 15-11-94 (b) (4) (A) (iv).

[11] *In the Interest of A. T. H.*, supra at 573 (1).

years reformed to the point that [he] can take care of [A. L. S. S.] and provide [her] with a stable home."[12]

The same factors which show the existence of B. J.'s parental misconduct or inability also support the finding that the termination of B. J.'s parental rights would be in the child's best interest.[13] Furthermore, the record also shows that A. L. S. S. is thriving under the care of her foster parents and is a "fine, healthy, happy little girl." The caseworker testified that because of the child's age, the only option that will create a suitable permanency plan for her is adoption. Once B. J.'s rights are terminated, A. L. S. S. will become eligible for adoption by her foster parents, who have already indicated that they want to adopt her. Accordingly, the record supports the trial court's finding that the termination of B. J.'s parental rights was in the best interest of the child.

2. OCGA § 15-11-103 (a) (1), formerly OCGA § 15-11-90, provides that

If, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with a person related to the child by blood or marriage or with a member of the child's extended family if such a person is willing and, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child, if the court determines such placement is the most appropriate for and in the best interest of the child.

We reject B. J.'s arguments that the trial court erred in finding that DFCS conducted a thorough search for relatives of A. L. S. S. with whom to place her, and that DFCS's rejection of his sister Lavone Jackson's home was erroneously based on his failure to legitimate A. L. S. S. As discussed below, the record shows that all of the relatives suggested by B. J. were investigated by DFCS and, for various reasons, were determined to be unsuitable. We will not disturb a trial court's determination that placement with a relative is not in the best interest of the child absent an abuse of discretion,[14] which we do not find here.

Conner testified that when she met with B. J. at the Bryan County Jail, he gave her the names of five relatives whom he wanted

[12] *In the Interest of M. N. L.*, 221 Ga. App. 123, 125 (3) (470 SE2d 753) (1996).

[13] *In the Interest of D. S.*, 247 Ga. App. 569, 573 (545 SE2d 1) (2001); *In the Interest of G. K. J.*, 187 Ga. App. 443, 444 (2) (370 SE2d 490) (1988).

[14] *In the Interest of B. R. W.*, 242 Ga. App. 232, 241 (3) (530 SE2d 5) (2000).

DFCS to evaluate for A. L. S. S.'s placement. All five people lived at the same address with B. J.'s mother. The home evaluation of B. J.'s mother was disapproved because she had health problems and because a convicted child molester resided in her home. When she informed B. J. that his mother had not been approved, he asked that she evaluate a sister, who lived in Rhode Island, but that sister declined the evaluation. Home evaluations on A. L. S. S.'s mother's sister and maternal grandmother were also disapproved. Conner did not recall that B. J. recommended that his sister, Lavone Jackson, be evaluated, but the record shows that he did.

Brantley testified that during the nonreunification hearing, B. J. requested that DFCS consider Lavone, and his brother, Michael, as relatives with whom A. L. S. S. could live. Brantley requested an evaluation on Lavone, which was denied because Lavone did not cooperate with DFCS. B. J.'s brother, Michael, who lived with their mother, never returned Brantley's calls.

Brenda Smith, a placement worker with DFCS, testified that she was asked to conduct home evaluations on Lavone twice. Smith explained that in July 2000, Lavone was not considered for placement because she told Smith that she did not want to have her home evaluated. The second evaluation was conducted in September 2001. Smith met with Lavone at Lavone's home and determined that the house was adequate. Lavone had four children, including sixteen-year-old twin boys and a second set of twelve-year-old twins. Smith met with Lavone's two younger children but did not meet with the older twins because they were not home. Smith explained that she was required to meet with everyone who resided in the home to ascertain their feelings about the placement.

Lavone promised to bring her sons to DFCS to meet with Smith on the following day, but she never did. Consequently, Smith assumed that Lavone was no longer interested in being evaluated. After meeting with Lavone, Smith also learned that B. J. had not completed the legitimation process, which she testified was required to complete Lavone's home evaluation. In December 2001, after Lavone's home had already been disapproved, Lavone asked to bring her sons to meet with Smith, but Smith told her that the evaluation had been completed.

Lavone testified that she refused the first evaluation because she did not have a place to live. During the second evaluation, she testified that she told her sons to meet with Smith, and that they told her that they went to Smith's office, but she was not there. On cross-examination, when asked what she had done to have A. L. S. S. placed in her home, Lavone replied, "I haven't done nothing to try to get A. L. S. S. to my house." She admitted that aside from telling her boys to visit Smith, she did nothing to make that meeting happen;

that she had only visited the child twice and had no bond with her; and that she had never contacted DFCS to request visitation with the child.

B. J. relies on *In the Interest of S. H.*[15] to support his argument that the trial court erred by affirming the finding that Lavone was not a suitable relative with whom A. L. S. S. could reside based on B. J.'s failure to legitimate A. L. S. S. In that case, DFCS suspended the investigation for the sole reason that paternity had not been established. There, we expressly reserved ruling on whether the grandfather of the appellant was suitable to take care of the child at issue but held that if it could be shown that he was the child's blood relative, he must be investigated and considered as a possible placement by DFCS.[16] However, in *In the Interest of S. H.*, we also found no abuse of discretion where the court found that the child's placement with her grandmother was not suitable because "she failed to cooperate with the agency's investigation . . . and had other people living in her home who would not cooperate with the investigation."[17]

Despite B. J.'s failure to legitimate A. L. S. S., DFCS attempted to conduct two home evaluations on his sister Lavone. The first was disapproved because Lavone did not want to be evaluated, and the second because Lavone and her sons did not cooperate with DFCS. Unlike in *In the Interest of S. H.*, the investigation was not suspended because B. J. had not established paternity. Furthermore, there was evidence that Lavone had no bond with the child, had not tried to establish one, and had never requested visitation with the child. Lavone testified that she visited the child twice, on the day that she was born and when she took B. J. to see A. L. S. S. on January 9, 2001, which makes Lavone far more akin to the grandmother in *In the Interest of S. H.* than the grandfather. Moreover, we have previously affirmed a juvenile court's finding that a placement with a relative who actually received a favorable evaluation was not in the child's best interest where the relative had only seen the child five times and had no bond with the child, who had bonded with her foster mother.[18] We went on to hold that "[i]n light of this evidence, proof that the child would remain in a safe and stable foster home upon termination of the mother's parental rights and evidence of the foster mother's intent to adopt the child, we find no abuse of discretion in failing to place the child with a family member upon termination of the mother's parental rights."[19] The same result is warranted here.

---

[15] Supra.

[16] Id. at 559 (2) (b).

[17] Id. at 559 (2) (a).

[18] *In the Interest of C. L. R.*, 232 Ga. App. 134, 139 (3) (501 SE2d 296) (1998).

[19] (Citations and punctuation omitted.) Id.

*Judgment affirmed. Johnson, P. J., and Eldridge, J., concur.*

DECIDED NOVEMBER 25, 2003.

*McCullough & Swindell, Brantley J. Swindell,* for appellant.
*Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Newton, Smith, Durden, Kaufold & Rice, Sherri P. McDonald,* for appellee.