A05A0483. IN THE INTEREST OF J. S. T. S. et al., children.

(614 SE2d 863)

MIKELL, Judge.

C. S., the biological mother of J. S. T. S. and A. S. L. W., appeals the juvenile court's order terminating her parental rights[1] and award-

---

Ga. App. 385, 387 (2) (565 SE2d 579) (2002).

[8] (Footnote omitted.) *Jones,* supra at 218 (3) (a).

[1] The order also terminates the rights of J. S. T. S.'s biological and legal father, who consented to the termination. The rights of A. S. L. W.'s biological/putative father were also terminated, but he is not a party to this appeal.

ing permanent custody to Sam and Amanda Haley. For the reasons set forth below, we affirm.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[2] "We do not weigh the evidence and must defer to the trial judge as the factfinder."[3]

So viewed, the evidence shows that the Whitfield County Department of Family and Children Services ("DFCS") obtained emergency custody of 12-day-old J. S. T. S. on April 25, 2002, because C. S. and the baby were homeless and the baby was losing weight. The juvenile court found that the child was failing to thrive and needed medical attention and proper care. On May 28, 2002, DFCS implemented a 30-day reunification and concurrent nonreunification case plan for C. S. The plan required the appellant to establish and maintain safe, stable housing and appropriate income for the needs of her family, complete an anger management assessment program, submit to a psychological evaluation and comply with recommended treatment, improve her parenting skills, and cooperate with DFCS. In order to cooperate with DFCS, C. S. was required to keep them apprised of her whereabouts, have consistent supervised visitation with her children, pay child support, have weekly telephone contact with her case manager, submit to random drug screening, and seek treatment in the event of a positive drug screen.

On July 25, 2002, the juvenile court entered an order that J. S. T. S. was deprived and awarded temporary legal custody to DFCS. Approximately one month later, the juvenile court entered a provisional order that transferred custody of J. S. T. S. to Clarence and Donna Griffin for a period of two years.[4] As a part of that order, C. S. was directed to complete her case plan, visit J. S. T. S. every other weekend and every Wednesday, and pay child support. The order was made final on October 9, 2002.

On September 10, 2002, the Griffins filed a petition to terminate C. S.'s visitation with J. S. T. S., or in the alternative, have it take place at the Murray County Sheriff's Department. In their petition, the Griffins alleged the following: they were robbed at gunpoint by someone they believed to be associated with C. S.; C. S. had threatened their safety; she had not complied with the visitation schedule;

---

[2] *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001).

[3] (Citation and punctuation omitted.) *In the Interest of C. F.*, 251 Ga. App. 708 (555 SE2d 81) (2001).

[4] The Griffins had custody of appellant's first child, S. S.

she admitted to causing her first child's brain injury; and she was unstable and exhibited erratic and hostile behavior. In response thereto, the juvenile court transferred custody of J. S. T. S. back to DFCS, which placed the child in the home of his paternal cousin, Amanda Haley and her husband, Sam Haley. In its order, the juvenile court found that C. S. failed to appear for any scheduled visits; that she appeared unannounced at the Griffins' home and demanded a visit; that upon being told that the child was not home, she became so belligerent that she was arrested; that she was involuntarily committed to Rome Regional Hospital for evaluation later that day; that she threatened the Griffins; that she had numerous mental illnesses but refused medication; that she was unemployed; that she had not completed the case plan on her first child; and that because of her acrimonious relationship with the Griffins, continued visitation would place J. S. T. S. in imminent danger of harm.

On October 31, 2002, DFCS implemented another case plan for C. S., which required compliance with the goals contained in the previous case plan. The juvenile court entered an order that incorporated that case plan. C. S.'s progress was reviewed by judicial citizen panels on January 17, 2003, July 18, 2003, and December 16, 2003. Each panel recommended the termination of C. S.'s parental rights.

On June 12, 2003, C. S. gave birth to A. S. L. W. On August 14, 2003, DFCS obtained custody of A. S. L. W. In its temporary placement order regarding A. S. L. W., the court made the following findings of fact: C. S. was repeatedly dishonest about where she lived; she repeatedly perjured herself before the juvenile court; she knew that the child needed to be on an apnea monitor when sleeping but left the child with a relative without providing instructions about the monitor; she failed to give A. S. L. W. medication; she was unemployed; she tested positive for amphetamine on August 14, 2003; she failed to complete case plan goals for her two older children; she voluntarily relinquished her rights to her first child; and the termination of her rights to the second child was pending. The juvenile court awarded temporary custody to DFCS, after concluding that A. S. L. W. was deprived and that it would be contrary to her welfare to remain with C. S. On September 11, 2003, a case plan was prepared, outlining goals that were substantially similar to those in J. S. T. S.'s case. C. S. did not attend the case plan meeting. The juvenile court issued a supplemental order incorporating the plan on October 24, 2003, and C. S. failed a drug test the following month.

On February 18, 2004, DFCS petitioned to terminate the parental rights of C. S., the children's legal father, and A. S. L. W.'s putative biological father. Because DFCS was unable to locate C. S. or the father of either child, it filed an affidavit for service by publication. On

February 27, 2004, the Haleys filed a motion to intervene and a petition for custody of A. S. L. W. The juvenile court held a hearing on the termination petition on August 12, 2004. C. S. was served notice of the final hearing but failed to appear. C. S.'s attorney informed the court that C. S. had not contacted him since March 4, 2004, when he was appointed, and requested that the court relieve him of his role as her attorney. The court granted the request.

At the hearing, Barbara Colburn, a DFCS caseworker, testified that she was in charge of handling the case files of J. S. T. S. and A. S. L. W. Regarding C. S.'s compliance with the case plan goals, Colburn testified that C. S. did not meet the visitation goals set out in the case plan. C. S.'s visits with the children were sporadic in that she missed more visits than she attended. In 2004, C. S. visited the children four times. Colburn testified that C. S. also failed to maintain consistent employment, as required by the case plans. Additionally, C. S. did not consistently submit for drug screening, and each time she was tested, the results were positive. In August 2003, she tested positive for amphetamine and methamphetamine. In November 2003, she tested positive for amphetamine and cocaine, and in April 2004, she tested positive for amphetamine and methamphetamine. C. S. did not pay child support, complete anger management courses, or attend parenting classes. C. S. also failed to maintain a stable residence, another goal of the case plan. Colburn testified that C. S. lived 13 different places during the time the case was pending. The only goal that C. S. met was the one that required her to undergo a psychological evaluation, but she did not follow the psychologist's recommendations.

Colburn observed C. S.'s visits with the children. She testified that C. S. was moody during the visits and had not bonded with the children. She further testified that A. S. L. W. cried at each visit and that J. S. T. S. always went to the other people in the room before going to C. S. as it took quite a while for him to warm up to her; that J. S. T. S. was doing well with the Haleys and seems to have bonded with them; that the Haleys were related to J. S. T. S. through his father; and that the Haleys wished to adopt J. S. T. S. Colburn further testified that the Haleys wished to adopt A. S. L. W. as well. Colburn opined that the termination of C. S.'s parental rights would be in the best interests of the children.

The guardian ad litem testified that he investigated the case; that he invited the children's parents to meet with him, but they did not do so; and that he met with and interviewed the Haleys, who he believed would give the children the stability they needed. He also opined that termination would be in the best interests of the children. The juvenile court terminated the parents' parental rights and awarded permanent custody of the children to the Haleys.

Before terminating parental rights, a juvenile court must employ a two-prong test.[5] First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[6] "In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child."[7] On appeal, C. S. argues that there was no clear and convincing evidence of parental misconduct or inability on her part or that termination would be in the children's best interests. We disagree.

C. S. does not challenge the existence of the first three factors under the first prong of the termination analysis. Therefore, our review is limited to whether clear and convincing evidence supports the juvenile court's findings as to the fourth factor; i.e., whether the children's continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to them.

We have recognized that the same facts that support a juvenile court's conclusion that a child is deprived and that the deprivation is likely to continue if placed with the parent also support a conclusion that continued deprivation would likely cause the child serious harm.[8] Other than submitting for a psychological evaluation, C. S. did not comply with any of the goals in her case plans. The evidence showed that C. S. failed to develop or maintain a bond with the children or support them. C. S. conceded in her brief that "she failed, without excuse, to complete her case plans for reunification with the children" and for a period of greater than a year, "made virtually no progress towards completing her case plans for reunification other than occasionally visiting the children." There was testimony that C. S. visited the children four times during 2004 and that when she visited, she was moody. Additionally, each time that C. S. was screened for drugs, as a part of her case plan, she tested positive. We have held that evidence of a mother's repeated failure to remain drug free and her failure to take the steps necessary to reunite with the children was sufficient to prove that the continued deprivation would

---

[5] OCGA § 15-11-94 (a); *In the Interest of C. F.*, supra at 711.

[6] OCGA § 15-11-94 (b) (4) (A) (i)-(iv); *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997).

[7] (Citation omitted.) *In the Interest of S. B.*, 237 Ga. App. 692, 693 (515 SE2d 209) (1999). Accord *In the Interest of R. N.*, supra.

[8] *In the Interest of M. J. T.*, 255 Ga. App. 553, 556 (565 SE2d 877) (2002).

cause the child serious physical, mental, emotional, or moral harm.[9] Additionally, it is well settled that "[c]hildren need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[10] The guardian ad litem testified that the Haleys would provide the stability the children needed. Therefore, we find that the evidence supports the juvenile court's finding that the continued deprivation is likely to cause the children serious harm.

C. S. attempts to analogize this case to *In the Interest of J. H.*,[11] in which we reversed the juvenile court's decision to terminate the parent's rights because there was no clear and convincing evidence that the child's continued relationship with the mother would cause her harm.[12] However, that case is factually distinguishable from the case sub judice. In that case, the child and her mother had a relationship as the child was nine years old when she was removed from her mother's custody, the mother made efforts to rehabilitate herself, and there was testimony that the child worshiped her mother and wanted to be with her. In the instant case, J. S. T. S. and A. S. L. W. were with C. S. for nine days and two months, respectively, before being removed from her custody. At the time of the hearing, J. S. T. S. was two years old and A. S. L. W. was a year old. Therefore, for the overwhelming majority of both of their lives, these children were not with their mother. Consequently, as stated earlier, neither child had bonded with C. S. and in fact, A. S. L. W. screamed and cried during each visit during 2004 and J. S. T. S. preferred others in the room to his mother. Unlike the mother in *In the Interest of J. H.*,[13] C. S. made no efforts to rehabilitate herself and most telling, did not even participate in the termination hearing despite receiving notice of the date that it would occur.

C. S. also argues that *In the Interest of J. H.* requires the reversal of the juvenile court's decision because the order did not contain explicit findings of fact to support the conclusion that serious harm would result from the continued deprivation. Again, C. S.'s argument misses the mark.

The juvenile court made specific findings that "the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children"; that the children "have suffered, are suffering, and will continue to suffer in the future as a result of the profoundly detrimental and egregious conduct of said parents"; that "the children are currently suffering and are in danger

---

[9] *In the Interest of B. I. F.*, 264 Ga. App. 777, 781 (1) (592 SE2d 441) (2003).
[10] *In the Interest of S. T.*, 244 Ga. App. 86, 88-89 (2) (534 SE2d 813) (2000).
[11] 258 Ga. App. 211 (573 SE2d 481) (2002).
[12] Id. at 216.
[13] Supra.

of suffering [serious harm] in the future . . . due to the mere continuance of the relationship with the parents on a visitation basis"; that "termination of parental rights would enable the children to achieve a more stable home life through adoption"; and that continuation of the parental relationship "would serve as an impediment to the future development of the children and their physical, mental and emotional health."

In *In the Interest of B. I. F.*[14] and *In the Interest of J. A. R. S.*,[15] the juvenile court made similar findings.[16] In both cases, we concluded that although the juvenile court did not identify specific facts supporting those findings, the fact that the order contained facts that supported the juvenile court's conclusion was sufficient.[17] The same result is warranted here.

As to the second prong of the analysis, the same factors which show the existence of C. S.'s parental misconduct or inability also support the finding that the termination of C. S.'s parental rights would be in the child's best interest.[18] Additionally, both the caseworker and guardian ad litem testified that the termination of C. S.'s rights would be in the best interests of the children. Accordingly, the record supports the trial court's finding that the termination of C. S.'s parental rights was in the best interests of the children.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED MAY 10, 2005.

*Rodney Q. Quarles*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Cynthia N. Johnson*, for appellee.

---

[14] Supra.
[15] 262 Ga. App. 237 (585 SE2d 184) (2003).
[16] *In the Interest of B. I. F.*, supra at 780 (1); *In the Interest of J. A. R. S.*, supra at 240 (2).
[17] Id.
[18] *In the Interest of D. S.*, 247 Ga. App. 569, 573 (545 SE2d 1) (2001); *In the Interest of G. K. J.*, 187 Ga. App. 443, 444 (2) (370 SE2d 490) (1988).