597 S.E.2d 531 (2004)
266 Ga.App. 456
In the Interest of D.M.W., a child.
No. A03A2558.
Court of Appeals of Georgia.
March 23, 2004.
Faye E. Hays, Stockbridge, for appellant.
Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Crumbley & Crumbley, Jason T. Harper, McDonough, for appellee.
MIKELL, Judge.
C.T., the biological mother of D.M.W., appeals the juvenile court's order terminating her parental rights[1] and awarding custody to *532 the Henry County Department of Family and Children Services ("DFCS"). For the reasons set forth below, we affirm the termination order.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[2] "We do not weigh the evidence and must defer to the trial judge as the factfinder."[3]
So viewed, the evidence shows that C.T. was arrested when D.M.W. was six months old and charged with kidnapping and armed robbery. While C.T. remained incarcerated, D.M.W. was removed from the home of his maternal grandmother and placed in the custody of DFCS, pursuant to an order for shelter care entered by the juvenile court on August 23, 2001. At that time the child was nine months old. DFCS determined that his grandmother was not a suitable placement for the child, because she was elderly and did not have the mental or physical capacity to care for him. Meanwhile, the putative father had not legitimated D.M.W. On November 6, 2001, the juvenile court entered a 72-hour order, relating back to the August 23 hearing, finding D.M.W. to be deprived and continued DFCS's temporary custody of the child. C.T. was present at that hearing and stipulated that the child was deprived as she was incarcerated without bond.
On August 28, 2001, DFCS filed a deprivation petition concerning D.M.W. The juvenile court conducted a hearing on that petition on September 6, and again entered an order finding that D.M.W. was deprived. That order was never appealed. DFCS developed a 30-day reunification plan for C.T.,[4] requiring her to maintain contact with D.M.W. and obtain and maintain a safe, secure, and stable home environment for the child and herself, resolve her legal issues, demonstrate her own mental stability, and cooperate and remain in contact with DFCS. The juvenile court approved the case plan. On November 8, however, C.T. was convicted of armed robbery and kidnapping and was sentenced to serve ten years in prison. Consequently, DFCS proposed a nonreunification plan for C.T. on February 21, 2002, but continued to develop reunification plans for the child's biological and legal fathers. Neither C.T. nor either father completed any of the goals of their case plans.
DFCS filed a petition to terminate the rights of D.M.W.'s parents on July 8, 2002. At the hearing on the petition, the court heard the testimony of C.T., the DFCS case manager, and one of C.T.'s relatives. The trial court also admitted the written report of the child's guardian ad litem, which recommended the termination of C.T.'s parental rights.
The caseworker, Leah Waters, testified that C.T. failed to comply with all of the goals of her reunification case plan. Although C.T. sent Waters five letters expressing her love for the child and her desire to be reconciled with him, the caseworker was unaware of any significant bond between the child and C.T. Waters further testified that C.T. had nine years left to serve on her sentence; that D.M.W. would be twelve years old upon her release; that the child would not be negatively affected by the termination of C.T.'s parental rights; that C.T. could not comply with a reunification case plan in the near future; that if the court terminated the child's parents' rights, DFCS's permanency plan for him was adoption; that his foster parents wanted to adopt him; that after investigating the relatives identified by C.T., DFCS determined that none of them would be a suitable placement for D.M.W.; and that none of those relatives ever tried to visit the child.
C.T. testified that she had taken a nine-month parenting class while in prison and did not want to lose her rights to D.M.W.; that *533 she did not know when she would be released from prison; that she wanted the child to be placed with someone in her family; that prior to her arrest, D.M.W. and four of her other children, who ranged in age from three to nine years old, lived with her; that the other four children were currently with their father; that she gave birth to twins while in prison and they were currently living with one of her friends; that D.M.W. was six months old when she was arrested and that she had not seen him since he was removed from her grandmother's custody in August 2001.
The juvenile court entered an order terminating C.T.'s parental rights on February 28, 2003. C.T. appeals.
Before terminating parental rights, a juvenile court must employ a two-prong test.[5] First, the juvenile court must make a finding of parental misconduct or inability, which is proved by clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[6] "In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child."[7] C.T. enumerates as error only the trial court's findings as to the first and third factors of the first prong of the test; however, she disputes its findings as to the second and fourth factors in her brief.
1. The juvenile court entered orders finding that D.M.W. was deprived on August 23, 2001, and on September 6, 2001, which C.T. did not appeal. "Therefore, [she] is bound by this finding of deprivation and the first factor is satisfied."[8]
2. C.T. also argues that the trial court erred by finding that the lack of proper parental care or control caused the child's deprivation. In so finding, "the court shall consider the various factors established by OCGA § 15-11-94(b)(4)(B) and (C). OCGA § 15-11-94(b)(4)(B)(iii) provides that the court shall consider the conviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship."[9] Though "[a] parent's incarceration does not always compel the termination of parental rights, ... it can support a termination when there are sufficient aggravating circumstances present."[10] One of the aggravating circumstances that may be considered is "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive [,] and parental manner."[11] Here, although C.T. sent letters to the caseworker expressing her love for the child, she did not make an effort to actually communicate directly with him after he was removed from C.T.'s grandmother's custody. Another aggravating factor is C.T.'s failure to comply with goals in her case reunification plan.[12]
*534 Since D.M.W. is not in C.T.'s custody, the juvenile court was also required to determine whether C.T. failed to comply with OCGA § 15-11-94(b)(4)(C)(i)-(iii) in assessing whether the child was without proper parental care and control. That statute requires a consideration of whether, without substantial justification, for a period of one year or longer prior to the filing of the termination petition, the mother failed significantly: "(i) [t]o develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii)[t]o provide for the care and support of the child as required by law or judicial decree; and (iii)[t]o comply with a court ordered plan designed to reunite the child with the [appellant]."[13] C.T. testified that she was arrested when the child was six months old and that she saw him a couple of times at the jail when he was still in her grandmother's custody. The petition to terminate C.T.'s parental rights was filed on July 8, 2002. Even if we assume that C.T. developed a bond with the child during the first few months of his life, the evidence shows that for a period of one year, C.T. did not maintain that bond because she did not see him. C.T. also did not support the child financially or comply with the portion of the DFCS's case plan with which she was able to comply; i.e., maintaining meaningful contact with the child. Accordingly, the trial court's finding that lack of proper parental control caused the child's deprivation was supported by clear and convincing evidence.
3. C.T. argues that there was insufficient evidence that the deprivation would continue and that D.M.W. had been harmed by that deprivation. In evaluating these factors, a juvenile court is authorized to consider "the length of a parent's incarceration, and thus the length of time the child must stay in foster care before any reunification is possible."[14] C.T. has been incarcerated since the child was six months old and by the time she is released from prison, the child will be twelve years old. Additionally, we have held that a "criminal conviction, [along with] near continuous incarceration during the child's life, and [the] failure to comply with reunification case plans [while incarcerated] provide[s] ample grounds for [the] termination of ... parental rights."[15] Furthermore, although "DFCS is obligated to pursue alternatives to termination, which it did in this case,... it is not obligated to gamble the child's prospects for a good life on the possibility that the mother will emerge from prison in [nine] years reformed to the point that she can take care of [D.M.W.] and provide him with a stable home."[16] In this case, there was evidence that the child was very attached to his foster parents, that he was healthy and living in a safe, secure home environment, and that his foster parents stood ready to adopt him upon the termination of his parents' rights. Therefore, the evidence in the record supports the court's finding, by clear and convincing evidence, that D.M.W.'s deprivation would continue and that the child would be harmed by the continued deprivation. Accordingly, we affirm the juvenile court's order terminating C.T.'s parental rights.[17]
Judgment affirmed.
JOHNSON, P.J., and ELDRIDGE, J., concur.
NOTES
[1] The order also terminates the rights of D.M.W.'s biological/putative father and her legal father, but they are not parties to this appeal.
[2] In the Interest of S.H., 251 Ga.App. 555(1), 553 S.E.2d 849 (2001).
[3] (Citation and punctuation omitted.) In the Interest of C.F., 251 Ga.App. 708, 555 S.E.2d 81 (2001).
[4] DFCS also developed case plans for D.M.W.'s biological and legal fathers.
[5] OCGA § 15-11-94(a); In the Interest of C.F., supra at 711, 555 S.E.2d 81.
[6] OCGA § 15-11-94(b)(4)(A)(i)-(iv); In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
[7] (Citation omitted.) In the Interest of Se.B., 237 Ga.App. 692, 693, 515 S.E.2d 209 (1999). Accord In the Interest of R.N., supra.
[8] (Citations omitted.) In the Interest of E.C., 225 Ga.App. 12, 15, 482 S.E.2d 522 (1997).
[9] (Punctuation omitted.) In the Interest of K.W., 262 Ga.App. 744, 746(1)(b), 586 S.E.2d 423 (2003).
[10] (Footnote omitted.) In the Interest of M.C.L., 251 Ga.App. 132, 134(1)(a), 553 S.E.2d 647 (2001); In the Interest of A.T.H., 248 Ga.App. 570, 572(1), 547 S.E.2d 299 (2001).
[11] (Punctuation and footnote omitted.) Stills v. Johnson, 272 Ga. 645, 651(3), 533 S.E.2d 695 (2000).
[12] In the Interest of M.C.L., supra at 135(1), 553 S.E.2d 647. See In the Interest of K.B., 252 Ga.App. 808, 810, 556 S.E.2d 922 (2001) (failure to provide parental care and support considered an aggravating circumstance); In the Interest of A.T.H., supra at 572(1), 547 S.E.2d 299 (aggravating circumstances found where a parent has not visited regularly with the child or established a parental bond and has no present prospects for employment as required by case plan).
[13] OCGA § 15-11-94(b)(4)(C).
[14] (Footnote omitted.) In the Interest of A.T.H., supra at 572(1), 547 S.E.2d 299.
[15] (Footnote omitted.) In the Interest of A.R.G.B., 251 Ga.App. 673, 674(4), 555 S.E.2d 42 (2001).
[16] In the Interest of M.N.L., 221 Ga.App. 123, 125(3), 470 S.E.2d 753 (1996).
[17] See In the Interest of R.W., 265 Ga.App. 181, 593 S.E.2d 367 (2004) (incarcerated father's parental rights terminated where father's incarceration prevented him from having a relationship with his children, children would be virtual strangers to their father upon his release from prison, and foster family wanted to adopt the children); Turner v. Wright, 217 Ga.App. 368, 369(1), 457 S.E.2d 575 (1995) (father's incarceration and his resulting inability to fulfill the responsibilities of parenthood were due solely to his own voluntary criminal conduct and offered no basis for him to object to the termination of his parental rights).