A10A0883. IN THE INTEREST OF A. M. et al., children.

(702 SE2d 686)

MILLER, Chief Judge.

The mother and father of A. M., An. M.,[1] D. M., E. M., and M. M. appeal the juvenile court's order granting the Department of Family and Children Services' motion to extend custody with the Department and to discontinue efforts to reunify the parents with their children. The parents claim that the trial court erred in (i) finding that reasonable efforts for reunification would be detrimental to the children, (ii) misreading the requirements of their case plan, and (iii) holding that they suffered from a "medically verifiable deficiency" related to their mental status. The parents also argue that the trial court erred in "giving weight" to the Department's opinions as to the parents' competency because the Department failed to meet its case plan goals by not providing the parents with a Spanish-speaking parental aide. Inasmuch as the trial court erred in finding that the parents suffered from a medically verifiable deficiency of their mental health such as to render them incapable of providing for the physical needs of the children, we vacate the trial court's order terminating reunification services and remand the case with direction. For the reasons set forth below, we affirm the trial court's order extending custody of the children with the Department.

As a rule, if the juvenile court places custody of a child with the Department, "reasonable efforts shall be made to preserve and reunify families . . . [t]o make it possible for a child to return safely to the child's home." OCGA § 15-11-58 (a) (2). The Department may, however, recommend that reunification services are not appropriate. See OCGA § 15-11-58 (e), (f). Pursuant to OCGA § 15-11-58 (h),

> [w]hen reviewing the determination by the [Department] that a reunification plan is not appropriate, the court shall determine by clear and convincing evidence whether reasonable efforts to reunify a child with his or her family will be detrimental to the child and that reunification services, therefore, should not be provided or should be terminated.

As the appellate court, we view the evidence in the light most favorable to the trial court's judgment to "determine whether any rational trier of fact could have found by clear and convincing evidence that reasonable efforts to reunify the children with their [parents] would be detrimental to them and therefore reunification

---

[1] We refer to the twins, who share the same initials, as "A. M." and "An. M."

services should be [terminated]." (Footnote omitted.) *In the Interest of S. L. E.*, 280 Ga. App. 145, 146-147 (1) (633 SE2d 454) (2006).

So viewed, the evidence shows that in July 2008, A. M., An. M., M. M., and E. M., all of whom were under the age of four, were placed in shelter care. According to the shelter care order, the children were referred to the Department due to serious health concerns, particularly malnutrition. D. M. was born in November 2008, and taken into Department care shortly thereafter. The trial court subsequently found the children to be deprived and placed legal custody of the children in the Department for a year from the date of their removal from the home. The trial court also found that before the Department sought custody An. M. and E. M. were hospitalized for treatment for malnutrition and that their condition worsened upon release to their parents.

In June 2009, the Department filed motions to extend custody of the children with the Department and for nonreunification. At the evidentiary hearing, the case manager, Barbara Clark, explained the array of medical issues facing the children. A. M. and An. M., the oldest, were twins. As described by Clark, both have deformities to their face. They have frequent bouts of pneumonia and chest infections. An. M. is on a feeding tube and experiences seizures. E. M. and M. M. require feeding tubes because they are developmentally delayed and cannot swallow. The youngest, D. M., although described as the healthiest child, has a brain shunt inserted into her head which requires monitoring.

Clark also described the parents' progress on their case plan. According to Clark, the parents had sufficient housing; they were both employed; they had paid approximately $1,200 in child support; they submitted to psychological examinations; they completed parenting classes; and they had regular visits with the children. Nevertheless, Clark opined that the parents had not progressed sufficiently in understanding the children's medical needs to allow unsupervised visitation. As an example, she cited the parents' failure to purchase a high chair which suited An. M.'s need to sit straight up.

According to Clark, the Department used a "bilingual contractor," Debbi Castillo, to provide "hands on directional parenting" services. Castillo testified that she interacted with the parents on a "one on one" basis, and that based on her observations the parents were not able to care for their children because the children have too many special needs, "extremely, extremely" so, and that the parents "take forever to learn things." As an example, she cited the parents' problems in getting the children's food thickener "to be just right" so that the food would not be so thin as to cause the children to aspirate. According to Castillo, however, the parents "learn things eventually."

The parents do not speak any English. On cross-examination, Castillo admitted that her formal training in Spanish consisted of one three-month class, and she rated her Spanish as "[k]ind of like a small child." According to the mother, Castillo used English and Spanish words together, and she did not understand the English words.

The foster mother testified that she witnessed behavior by the parents that disturbed her. This included an incident in which the father upset E. M. to the point of crying by putting her in a stroller and walking away repeatedly while laughing, and another incident in which the parents were argumentative with the children's pediatrician as to whether the children were malnourished. The foster mother's diary of personal observations recounted that the parents missed the children's medical appointments, interfered with the children's therapy, and had continuing trouble with the children's medication.

Findings in the parents' psychological evaluations, which are discussed in further detail in Division 5, infra, showed that "the parents have little understanding of the proper care of their children," and poor parental competence.

1. Although the parents contend that the trial court erred in granting both the Department's motion to extend custody and motion to terminate reunification efforts, the parents present no argument to support their general assertion that the grant of the motion to extend custody of the children with the Department was erroneous. Accordingly, the parents' claim that the trial court erred in granting the Department's motion to extend custody is deemed abandoned under Court of Appeals Rule 25 (c) (2). See *Kemp v. Adams*, 297 Ga. App. 548, 549 (2) (677 SE2d 743) (2009).

2. The parents claim that the trial court erred in granting the Department's motion for nonreunification because there was insufficient evidence that reunification efforts would be detrimental to the children. We disagree.

Evidence supports the trial court's finding that the parents are not currently able to meet their children's medical needs and that the children's lives would be endangered if the appropriate level of care is not maintained. In addition, the children were removed from the parents' care after two of the children suffered from malnutrition that required hospitalization. The parents' physical neglect of the children and their continuing inability to meet their children's extensive medical needs was sufficient for any rational trier of fact to find by clear and convincing evidence that reunification efforts would be detrimental to the children. See *In the Interest of R. N. R.*, 257 Ga. App. 93, 95 (1) (570 SE2d 388) (2002) (evidence of physical neglect and mother's denial of responsibility for the children's

emaciated condition supported finding that reunification would be detrimental to the children); *In the Interest of C. N.*, 231 Ga. App. 639, 640 (1) (500 SE2d 400) (1998) (evidence that reunification would be detrimental to the children included, among other things, that reunification would expose the children to educational neglect and inadequate supervision and that the mother had failed to make significant progress notwithstanding intensive support).

3. The parents claim that the trial court erred in misreading their case plan to include goals that were not expressed in the plan. We disagree.

According to the trial court, "the parents have objectively completed the case plan goals designed to reunite them with their children" except for two goals: "recommended individual therapy and learning of English as a second language." These requirements arose from the trial court's finding that the case plan required the parents submit to a psychological evaluation and follow through with any recommended treatment.

The parents argue that their case plan says nothing about the treatment and follow-through requirements. While the parents' "case plan report" does not mention a psychological evaluation, the trial court's January 21, 2009 "order incorporating a case plan" specifically contemplates delivery of a psychological evaluation of the parents and orders all parties to comply with "requirements for evaluation and treatment." At the hearing, the case manager testified to the parents' completion of the psychological examinations in the context of their case plan requirements, and it is undisputed that the parents submitted to the evaluations. In view of the foregoing, evidence supported the trial court's finding that the parents' case plan required them to have a psychological examination and follow through with recommended treatment. Further, the psychologist who recommended English as a second language classes pointed to the parents' language limitations as causing them to miss "information necessary to provide appropriate medical care for the children." Accordingly, the recommended action was directly related to the circumstances which required the children be separated from the parents. It follows that the recommended action could be included in the case plan without further judicial review.[2] See OCGA § 15-11-58 (c) (3) ("actions required of the parents which are not directly related to the circumstances necessitating separation cannot be made conditions of the return of the child without further court review"); *In the Interest of H. F. G.*, 281 Ga. App. 22, 28 (2) (635 SE2d 338) (2006) (case plan goals addressed reasons for removal of child

---

[2] The parents do not challenge the individual therapy recommendation.

from the mother's custody by requiring mother to show she could be a fit parent).[3]

4. The parents also argue that the Department failed to meet its duties under the reunification case plan by failing to provide them with a Spanish-speaking parental aide. It is not clear how the parents link the alleged failure on the part of the Department to the trial court's alleged error in "giving weight" to the Department's opinions. In any case, the Department "has no legal obligation to provide the assistance necessary for a parent to complete reunification goals." (Footnote omitted.) *In the Interest of M. A.*, 287 Ga. App. 719, 721 (652 SE2d 613) (2007). See *In the Interest of A. H.*, 278 Ga. App. 192, 195 (1) (628 SE2d 626) (2006) (Department was not obligated to help the mother in addressing her mental health or drug abuse issues). Nor did the parents' case plan require the Department provide a Spanish-speaking aide. The Department was directed to provide the parents with a referral to appropriate parenting classes "geared to meet specialized needs of parent and/or child," and it did not fail in this respect. The parents attended and understood parenting classes conducted by Helicia Hernandez, who was fluent in Spanish.

5. The trial court found that "the parents have a medically verifiable deficiency of their mental health such as to render them incapable of providing adequately for the physical needs of the children." Notwithstanding the trial court's findings, no witness offered a competent opinion as to the parents' mental health or how a deficiency therein affected their ability to care for their children. See, e.g., *In the Interest of J. S. B.*, 277 Ga. App. 660, 663 (2) (d) (627 SE2d 402) (2006) (notwithstanding evidence of the mother's mental deficiency, no expert witness testified that the mental deficiency was detrimental to the children). By the stipulation of the parties, however, four psychological reports, two for each parent, were submitted into evidence for consideration by the trial court.[4] See *Stroud v. State*, 286 Ga. App. 124, 127 (2) (648 SE2d 476) (2007) (trial court, acting as factfinder, was entitled to draw any reasonable inference from expert's report admitted by stipulation); *In the Interest of D. P.*, 287 Ga. App. 168, 171 (1) (b) (651 SE2d 110) (2007) (mother stipulated to admission of psychological report). Compare *In*

---

[3] We note that the trial court found that certain elements of the case plan had not been completed, but not that "[t]he parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family." OCGA § 15-11-58 (h) (1).

[4] The latest two reports were unequivocally admitted by stipulation, and the parties do not challenge the trial court's express treatment of the earlier two reports as having been admitted by stipulation as well. In discussing the admission of the reports, the trial court also indicated it would hold the evidence open for the parties to submit any live testimony or depositions that they wished to present in connection with the reports.

*the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001) ("records which contain diagnostic opinions of third parties who are not available for cross-examination are generally inadmissible") (punctuation and footnote omitted). The parents contend that these reports are the only possible source of the trial court's finding of a "medically verifiable deficiency" of their mental health but provide no evidentiary support for its finding. We agree.

The initial psychological evaluations were performed approximately a year before the hearing on the Department's motion for nonreunification. The mother's mental status was reported as "alert and cooperative ... [and] stable," and the intelligence evaluation provides that she "did not present as being mentally deficient." The report is critical of the mother's parenting ability, but *not* because of mental health issues. For example, the mother's ability to support the children's medical and educational needs is listed as "poor" because she "does not have the resources or education to care for these special needs children." The conclusions in the father's report are substantially the same as in the mother's.

Shortly before the hearing, the parents completed a second round of psychological evaluations. As in the initial reports, the mental status examination of both the father and mother is described favorably, although the mother conveyed symptoms of depression. The later reports differ significantly from the initial reports, however, in that the examining psychologists also tested the parents' intellectual and cognitive functioning. The mother's and father's "KBIT-2 IQ Composite" scores of 54 and 66, respectively, were reported to be on the extreme low end of the scale.

We have previously accepted evidence showing a parent's mental impairment, which may include evidence of low IQ test scores, as demonstrating an inability to furnish proper parental care and control. See *In the Interest of T. B. R.*, 304 Ga. App. 773, 781 (1) (c) (697 SE2d 878) (2010); *In the Interest of H. F. G.*, supra, 281 Ga. App. at 27 (1); *In re S. R. J.*, 176 Ga. App. 685 (337 SE2d 444) (1985). But there is no evidence in this case which places the parents' low IQ scores within the context of their ability to care for their children. Compare, e.g., *In the Interest of T. B. R.*, supra, 304 Ga. App. at 776 ("the psychologist opined that based on the mother's level of intellectual and emotional functioning, it would be very difficult for her to supervise or care for an autistic child"). Further, the reports cannot be fairly read to demonstrate a deficiency in the parents' mental health. The mother's report states that IQ scores tell only some aspects of a person's ability, cites the mother's significantly differing scores on the verbal and nonverbal portion of the test as requiring judicious interpretation of the results, and further cautions that "many items" referenced in the KBIT test are unknown to

the Spanish culture.[5] The father's report also cautions that the test results are only a partial indicator of ability. Neither report suggests that either the mother or the father lack the mental competency to care for their children. Compare *In the Interest of J. W.*, 271 Ga. App. 518, 519 (610 SE2d 144) (2005) (examiner found it unlikely, even with intensive parent education, that the father had the capacity to become independently responsible for his special needs child).

We conclude that no evidence supported the trial court's finding of a medically verifiable deficiency of the parents' mental health of such duration or nature as to render them unable to provide adequately for the physical needs of their children. The erroneous finding was sufficient to have influenced the trial court's decision to terminate reunification efforts. For example, in explaining why it was terminating reunification services, the trial court cited its lack of confidence that the parents would "ever be capable" of caring for the children. See, e.g., *In the Interest of A. W.*, 264 Ga. App. 705, 708 (3) (592 SE2d 177) (2003) (as mistake of fact may have influenced trial court's decision to terminate mother's parental rights, order vacated with direction to review and reissue its opinion).

In addition, the trial court made the finding of a medically verifiable deficiency in light of the statutory presumption that reunification services should not be provided if any of the grounds for terminating parental rights exist. See OCGA § 15-11-58 (h) (3) (there is a presumption against provision of reunification services if the court finds by clear and convincing evidence that any of the grounds for terminating parental rights exist under OCGA § 15-11-94); *In the Interest of T. W.*, 288 Ga. App. 386, 390 (2) (654 SE2d 218) (2007) (a finding under criteria of OCGA § 15-11-94 (b) (4) (B) (i) ("[a] medically verifiable deficiency of the parent's . . . mental . . . health . . . of such duration or nature as to render the parent unable to provide adequately for the physical . . . needs of the child") is sufficient to support presumption against further reunification efforts). Since there was no evidence of such a medically verifiable deficiency, no presumption against reunification arose on such account.

In view of the foregoing, we vacate the trial court's order to the extent that it grants the Department's motion for nonreunification and "remand the case to the trial court for a review of its order and its reissuance, consistent with its findings based on the facts of this case. The [parents are] authorized to appeal from the new ruling within 30 days thereof." *In the Interest of A. W.*, supra, 264 Ga. App. at 708 (3). See *J. B. L. v. State*, 144 Ga. App. 223 (241 SE2d 40) (1977)

---

[5] The report also provides: "Interpretation by unqualified individuals may be subject to bias, distortion, or misinterpretation."

(as erroneous finding may have affected juvenile court's ruling as to disposition, trial court directed to reconsider that portion of the case anew). The trial court's order is affirmed insofar as it extends custody of the children with the Department.

*Judgment affirmed in part and vacated in part, and case remanded with direction. Phipps, P. J., and Johnson, J., concur.*

DECIDED OCTOBER 6, 2010.

*Paul N. Monnin,* for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Bruce A. Kling,* for appellee.