**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 21, 2013**

# In the Court of Appeals of Georgia

A13A1551. IN THE INTEREST OF T. Z. L., a child.

PHIPPS, Chief Judge.

In this discretionary appeal, the father of T. Z. L. contests the termination of his parental rights, claiming insufficiency of the evidence and violation of his due process rights. Because the evidence was insufficient, we reverse the termination, and remand the case with direction.

Four-year-old T. Z. L. came into the immediate protective custody of the Georgia Department of Human Resources Division of Family & Children Services (DFCS) on April 11, 2012, after he was severely injured. At that time, the child was living with his mother and her boyfriend; T. Z. L.'s father had been incarcerated for about ten months.

On April 20, 2012, DFCS filed a deprivation petition, alleging that T. Z. L.'s injuries had been inflicted by the mother's boyfriend, that the child's mother had failed to obtain medical treatment for him and had instead attempted to hide the child's condition from investigating authorities, that the mother was subsequently arrested and charged with child cruelty, and that the father was incarcerated and thus unable to care for T. Z. L. After a hearing, the juvenile court adjudicated T. Z. L. deprived.[1] In the deprivation order entered on May 8, the juvenile court found that the child had been severely beaten by the mother's boyfriend; that the mother had failed to obtain medical treatment for the child's injuries, instead absconding with the child and eventually claiming that he had fallen down stairs; that the mother and her boyfriend were in jail in connection with the child's injuries; and that "[t]he causes of deprivation as to the father are his current incarceration, substance abuse, and extensive criminal history." The juvenile court placed T. Z. L. in DFCS's temporary custody, ordered an assessment of the child and his family, and ruled, "Until further Order of this court, the parents shall have NO VISITS with the child."

The record contains a "Case Plan Report," which was dated and filed with the juvenile court on May 11, 2012. It stated that the "Plan Type" was "Nonreunification"

[1] See OCGA § 15-11-2 (8) (A) (defining "deprived").

2

and that the "Permanency plan" was "Adoption." The "Case Plan Report" set forth "Non-reunification Goals," specifying actions for DFCS that included "complet[ing] the necessary documentation to assure the adoption is finalized in a timely manner." Steps for "All Parents" included "attend[ing] all hearing, appointments with DFCS, Case Plan reviews, and scheduled visits with children," although another page that was included in the "Case Plan Report" noted that the juvenile court had "SUSPENDED AT THIS TIME" parental visits with T. Z. L. and noted further, as an additional "barrier[ ] to visitation," that "[the father] is incarcerated." The final pages of the "Case Plan Report" set forth blank lines reserved for the parents' signatures for acknowledging having "received a copy of this case plan report, [that] the plan has been explained to me," and that "this case plan will become part of the court order unless I request a hearing within five (5) days after I receive it." Notably, *none* of the reserved lines contained any signature; the sole signature upon the "Case Plan Report" was that of a DFCS case manager. Attached to the "Case Plan Report" were two pages entitled "Recommendations." Thereupon was stated that "[the father] is presently incarcerated and may be in jail for an extended time. He reported he would be in jail for thirteen to fourteen weeks." The attached document further enumerated that the father, inter alia: "should maintain employment"; "should have stable housing

for six months"; and "should be provided a psychological assessment and address all recommendations."

On June 5, 2012, the juvenile court entered an order concerning that case plan, which order set forth,

> The goals of the plan were not reviewed with the mother or the father. Both are incarcerated. Both parents were given a copy of the case plan. The permanency plan was established as: non-reunification/tpr/adoption. It is hereby ORDERED, ADJUDGED, AND DECREED that said plan . . . is incorporated into this order."

Seemingly in contradiction to that language, however, the order also stated, "The Court finds that reasonable efforts *are* being made to make it possible for the child to safely return to the home."[2] The order concluded:

> [T]he parents are notified that they will need to complete the following in order to be considered for a return of custody: obtain/maintain stable income sufficient to meet the needs of the family; obtain/maintain stable housing with sufficient space to meet the needs of the family; complete a parent/nurturing class; have a psychological evaluation and follow through with all recommended treatment; pay support; the father will

---

[2] (Emphasis supplied.)

need to have a DNA paternity test and legitimate the child if same is positive.[3] There will be no visitation until further order of the court.

Meanwhile, the mother had surrendered to DFCS her parental rights to T. Z. L. on or about June 4, 2012. About a month thereafter, on July 6, 2012, DFCS filed a petition to terminate the father's parental rights under OCGA § 15-11-94, alleging that he remained incarcerated, was unable to care for T. Z. L., had a history of drug abuse, and had an extensive criminal record.

On August 21, 2012, the juvenile court entered a "Supplemental Order Following Citizen Panel Review and Permanency Hearing Order," which stated the following. A "Citizen Panel review meeting [was] held on August 9, 2012." "Upon review of the recommendations of the [Citizen] Panel," the court found that "[r]eturning [T. Z. L.] to the home would be contrary to the welfare of the child because: Child is a victim of physical abuse. Neither parent was present at panel. Panel supports [DFCS's] motion for a termination of parental rights." Further, the juvenile court found that "adoption" (as opposed to "reunification") was in the best interest of the child and was the "Permanency plan."

---

[3] Nothing in the record, before or after entry of this order, indicated that paternity or legitimation was an issue; nor do the parties on appeal argue that any paternity matter was at issue.

On September 11, 2012, the juvenile court granted DFCS's motion to appointed a process server and directed that specially appointed individual to serve the father with a summons in the termination action at the correctional facility where the father was incarcerated.

On November 27, 2012, the juvenile court convened a hearing on the termination petition, which concluded on December 4, 2012. T. Z. L. had turned five years old. Still incarcerated, the father attended no part of the hearing, but was represented at the hearing by counsel. T. Z. L. was represented by a guardian ad litem.

A therapist who had conducted part of the court-ordered assessment of T. Z. L.'s family testified that she had interviewed the father shortly after the child was taken into DFCS's custody. During their interview, she had asked the father about his drug and alcohol use, and he had told her that at about age 16 he became involved with drugs, which evolved into substance abuse problems for a period of time. The father had also admitted to having a criminal history; the therapist recalled that the father had said that he was then serving a 14-week sentence. Additionally, the father had briefly mentioned that, years earlier, he had been in a serious automobile accident. However, the therapist recounted, during most of their interview, the father had expounded upon his anger that T. Z. L. had been beaten.

6

DFCS called as a witness the child's maternal grandmother, who was asked to describe the relationship of T. Z. L.'s parents. She responded, "They drank, drugs, never stable, neither one of them ever held a job. I think the longest – [the father's] held one – the child's father was maybe three to six months." Throughout their relationship, as she recollected, "They either lived with me or [the father's] mother. They could never hold their own place." She had observed the father use methamphetamine in 2009, but had not seen him since 2010 or 2011; she was uncertain of which year.

DFCS tendered certified copies of four convictions for the purpose of showing the father's pattern and history of criminal activity as had been alleged in the termination petition. Those showed that: (i) in 2001, the father pled guilty to theft by taking and was ordered to serve 30 days of a 12-month sentence in jail; (ii) in 2003, the father pled guilty to a drug charge and was ordered to serve 120 days of a seven-year sentence in jail; (iii) on October 26, 2011, the father pled guilty to theft by taking and was ordered to serve eight months of a five-year sentence in jail; and (iv) in early 2012, the father pled guilty to theft by taking and was sentenced to four years of confinement.

The father was 34 years old at the time of the termination hearing in 2012. His lawyer called to the stand the father's mother, who testified that he had used drugs from about age 17 through about age 26 or 27. During those years, the father had been in and out of jail. In 2003, the father was driving under the influence of alcohol and lost control of the car; the ensuing wreck left him with five fractures to his skull, fifteen hairline fractures to the back of his skull, and a permanent loss of hearing in one ear. DFCS's lawyer asked her, "He has not been the same since the accident, correct?" She answered, "Some things have been – he has short term memory loss. He forgets things easily. He gets confused easily. His hands will shake sometimes, but that's not the case anymore. He – He has gotten a lot better. He's a lot better." As of about 2006, she recalled, the hand tremors and short term memory issues ceased. And none of the injuries sustained in the car wreck had caused the father any difficulty in caring for T. Z. L., who was born in 2007.

When T. Z. L. was born, the father was 29 or 30 years old. Thereafter, the child's paternal grandmother recalled, the father, the mother, and T. Z. L. had lived primarily with her. She testified that she had encouraged that living arrangement, elaborating that she had purchased a five-bedroom house so that all her children could live with her. While T. Z. L.'s mother and father were living with her, the paternal

8

grandmother had witnessed verbal altercations between the two, but none were physical and none occurred in the presence of the child. She testified that T. Z. L. was close to his father and called him "Daddy," that the father and child loved each other and enjoyed playing together, and that the two had bonded. She had never observed the father harm T. Z. L. Since T. Z. L.'s birth, the paternal grandmother had seen no evidence that the father was using drugs. She testified that he was no longer experiencing a problem with drugs or alcohol. She summarized, "I've seen nothing that [the father] has done to ever lose his son forever."

After the father was most recently incarcerated, the mother moved out of the paternal grandmother's residence in about December 2011 to live with her boyfriend, taking T. Z. L. with her. And at some point prior to the termination hearing, the paternal grandmother lost her five-bedroom house to foreclosure, after which she moved in with individuals for whom she was providing care. As of the time of the termination hearing, the paternal grandmother had been residing there for eight months. She testified that the residence had adequate room available for T. Z. L. and that she therefore had insisted that DFCS conduct a home evaluation. She testified that she cleaned homes to earn her income. Meanwhile, she was working to again become independent so that the father and T. Z. L. could live with her. The paternal

9

grandmother was asked whether she had been "the source of [the father's] support most of his life," and she answered, "Most of it."

The paternal grandmother testified that T. Z. L.'s father would be released from his incarceration in six to eight months.[4] She described that her other son, the father's 31-year-old brother, had established a residence where he lived alone; that upon his release, the father would live with that brother; and that the brother had already "lined up" a job for the father.

At the hearing, the father's attorney submitted documentary evidence that the father had completed three courses in prison – life skills training, anger management, and setting boundaries.

The DFCS caseworker, who had been assigned the case in June 2012 and who had sought termination the following month, also testified. She had spoken with the father only twice because "it's very hard for me to get in touch with him in the jail." In June 2012, she informed the father that the mother had surrendered her parental rights to DFCS; and in July, she informed him that DFCS was pursuing the

_____

[4] See, however, *Stills v. Johnson*, 272 Ga. 645, 651-652 (3) (533 SE2d 695) (2000) ("An incarcerated parent's claim that parole is a future possibility at which time he or she will be able to care for the child is based entirely on conjecture.") (punctuation and footnote omitted); *In the Interest of M. C. L.*, 251 Ga. App. 132, 134 (1) (a) (553 SE2d 647) (2001) (same).

termination of his parental rights and that T. Z. L. would then be "free for adoption." The DFCS caseworker testified that the father told her that he was going to enroll in a parenting class and asked DFCS to allow his mother to have custody of T. Z. L. while he was imprisoned. The father indicated that he could be released from jail in seven or eight months, but as the DFCS caseworker recalled, "he wanted to serve his whole time so that when he got out he would not be on [sic] kind of probation."

The DFCS caseworker testified that the child's paternal grandmother had repeatedly contacted her and had been "aggressive" in seeking custody of T. Z. L. She recounted that DFCS had initially refused to consider placing T. Z. L. with her, but that "[w]e have just done the home evaluation for [the paternal grandmother]" in October 2012. But as the DFCS caseworker had discerned, the paternal grandmother had neither income nor "a place to live. She's living with these people that she – she's a caretaker for."

Meanwhile, the DFCS caseworker testified, the father had made efforts to maintain contact with T. Z. L. Since the child was placed in DFCS's custody, the father had written him 20 to 25 letters, and sent him handmade pictures. The DFCS caseworker had read the letters and described them as "very nurturing" in a parent-to-child sense. When asked whether she knew of any evidence that the father had

11

inflicted the injuries the child suffered in April 2012, she answered, "No. None at all."

However, the DFCS caseworker identified as problematic that the father had not undergone the requisite drug assessment and had not met imposed housing and employment goals. Additionally, the DFCS caseworker reiterated, DFCS remained concerned about the father's criminal history, history of drug use, and current incarceration. As she testified, "[J]ust from what I've read from the CCFA and his criminal history, he's been in and out of jail a lot in his life and it – and I just – I'm concerned that when he does get out of jail, who's to say that he's going to do right and get his child back." Furthermore, she explained,

> I'm not even sure when Dad's supposed to be discharged from prison, and we're already at six months plus, so if he's discharged in five or six months, then he has to work his, you know, case plan for at least six – I mean, we're looking at two years down the road and this child's too young to sit in foster care. . . . We need permanency as soon as we can.

The caseworker reported that T. Z. L. had been moved from his first foster care setting into another foster home. When asked whether it was "a foster home that is interested in possible adoption," the caseworker answered, "Yes." The child had been in that placement since late September 2012. A psychologist who had conducted part

12

of the court-ordered family assessment had observed interactions between T. Z. L. and those caretakers and testified that he seemed to have formed a bond with them. The caseworker reiterated that, if the juvenile court terminated the father's parental rights, DFCS intended to place the child for adoption.

The guardian ad litem pointed out to the juvenile court that the deprivation petition had been filed in April 2012, that the father was already incarcerated at that time, and that "the [DFCS caseworker's] testimony was that they believe the father will remain incarcerated, but you can't be sure about that and there just hasn't been enough time for him to complete his case plan yet." The guardian ad litem urged the court to allow the father time and opportunity to complete a reunification case plan.

In an order entered December 12, 2012, the juvenile court terminated the father's parental rights, relying on OCGA § 15-11-94. Under that Code section:

> In considering the termination of parental rights, the court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability . . . . If there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral

13

condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.[5]

The court determines "parental misconduct or inability" by finding that: (i) the child is deprived; (ii) the lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (iii) such cause of deprivation is likely to continue or will not likely be remedied; and (iv) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[6] Further, in determining whether the child is without "proper parental care and control, the court shall consider, without being limited to, the following:

(i) A medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child; (ii) Excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child; [and] (iii) Conviction of the parent of a felony and imprisonment therefor which

_____

[5] OCGA § 15-11-94 (a).

[6] OCGA § 15-11-94 (b) (4).

14

has a demonstrable negative effect on the quality of the parent-child relationship[.][7]

And where, as here,

> the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i) To develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) To provide for the care and support of the child as required by law or judicial decree; and (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents[.][8]

1. In considering the father's challenge to the sufficiency of the evidence, "[t]his court views the evidence in the light most favorable to the juvenile court's ruling to determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated."[9]

---

[7] OCGA § 15-11-94 (b) (4) (B).

[8] OCGA § 15-11-94 (b) (4) (C).

[9] *In the Interest of D. B.*, 306 Ga. App. 129 (701 SE2d 588) (2010) (footnote omitted).

15

In the termination order, the juvenile court recited that T. Z. L. had been adjudicated deprived because, as relating specifically to the father, "[he] was incarcerated and unable to care for the child. He was found to have a ten year history of abusing drugs and a lengthy criminal history." Citing evidence adduced from the therapist, the court found that the father has an "unrehabilitated abuse of substances which have affected his ability to properly parent the child." Citing the father's criminal convictions, the court found that "the father's repeated incarcerations have impacted his ability to properly parent and provide for the child." The juvenile court determined that, due to the father's history of incarcerations and drug use, the cause of the child's deprivation in that regard was likely to continue and would not likely be remedied. Further, the court determined that the father had suffered a head injury "which has apparently rendered him unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." The court took into account that "[e]ven if the father is released in six to eight months, he would then have to establish . . . stability in his life such as to render him fit to parent the child," determining that "[t]he child should not be required to wait indefinitely for stability and permanency on the mere hope and possibility that this time the father will remain out of jail or prison and complete the requirements of his court-ordered plan so that

16

he may be considered for a return of custody." The court stated that its findings underlying its determination that the child was deprived and that the deprivation was likely to continue also supported its determination that "continued deprivation would likely cause the child serious harm." Finally, the court determined, "This court entered a finding via supplemental order of the court, that it was contrary to the child's best interest to reunite him with either parent and that termination of parental rights and adoption were in the child's best interest. That order was not appealed and the parents are bound by its finding."

In this appeal, the father acknowledges that he was incarcerated throughout the pendency of this case before the juvenile court and that he was thus "incapable of assuming custody of his child. Therefore the finding of deprivation caused by the Appellant was warranted." The father does not challenge the juvenile court's findings that T. Z. L. was deprived or that his lack of proper parental care or control had caused the deprivation. The father does challenge, however, the sufficiency of the evidence to support these three requisite findings: (a) that the cause of deprivation was likely to continue or was not likely to be remedied;[10] (b) that continued

---

[10] OCGA § 15-11-94 (b) (4) (A) (iii).

17

deprivation would cause or likely cause harm to the child;[11] and (c) that termination of his parental rights was in T. Z. L.'s best interest.[12]

(a) We turn first to whether there was sufficient evidence to support the juvenile court's finding that the deprivation was likely to continue and would not likely be remedied. DFCS counters, "It is *doubtful* that Appellant can provide or maintain a stable home life for T. Z. L. which the juvenile court recognized. He has been incarcerated over half of his adult life, has worked very little, and has rarely lived independently."[13] But evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in his child.[14] "Although it is well settled that a juvenile court may consider the past conduct of the parent in determining whether the conditions of deprivation are likely to continue,"[15] it is also true that "[t]ermination of parental rights is a remedy of last resort which can be sustained only when there

---

[11] OCGA § 15-11-94 (b) (4) (A) (iv).

[12] OCGA § 15-11-94 (a).

[13] (Emphasis supplied.)

[14] *In the Interest of J. D. F.*, 277 Ga. App. 424, 427 (1) (626 SE2d 616) (2006) (citation and punctuation omitted).

[15] *In the Interest of C. S.*, 319 Ga. App. 138, 145 (1) (735 SE2d 140) (2012).

is *clear and convincing evidence* that the cause of the deprivation is likely to continue."[16] As to that requisite factor, the evidence fell short.

As the father correctly points out, a parent's incarceration does not always compel the termination of parental rights, but it can support a termination where sufficient aggravating circumstances are present.[17] One such factor that may be considered is "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive and parental manner."[18] Here, the juvenile court banned visitation between T. Z. L. and the father; yet, the father communicated with T. Z. L. by writing him 20 to 25 letters and sending him small gifts. The DFCS caseworker testified that the letters were "very nurturing" in a parent-to-child sense.

---

[16] *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999) (citation omitted; emphasis supplied).

[17] *Stills*, supra at 651 (3); see *In the Interest of J. D. F.*, supra.

[18] *Stills*, supra (punctuation and footnote omitted); see *In the Interest of J. D. F.*, supra at 427 (1); see *In the Interest of D. M. W.*, 266 Ga. App. 456, 459 (2) (597 SE2d 531) (2004).

19

Another aggravating factor that may be considered is the parent's "failure to comply with goals in a *reunification* plan."[19] OCGA § 15-11-94 (b) (4) (C) expressly contemplates that where, as here, the child is not in the custody of the parent who is the subject of the proceedings, a court-ordered plan be "designed to *reunite* the child with the parent."[20] Further, "the time limitation in OCGA § 15-11-94 (b) (4) (C) (iii) is designed to give the parent whose rights are subject to termination sufficient time and opportunity to demonstrate his or her ability to comply with the terms of the court's order."[21] But here, the only case plan formulated by DFCS, which plan was subsequently incorporated into a court order, was for *non-reunification*. And although that court-ordered case plan for non-reunification purported to include goals that would lead to the father being reunited with T. Z. L., many of those goals were not achievable given the father's incarceration.

For example, less than three months after T. Z. L. was placed in its custody, DFCS filed the termination petition. At the termination hearing, the DFCS

---

[19] *In the Interest of J. D. F.*, supra at 428 (1) (emphasis supplied); see *In the Interest of D. M. W.*, supra at 459.

[20] OCGA § 15-11-94 (b) (4) (C) (iii) (emphasis supplied).

[21] *In the Interest of B. N. A.*, 248 Ga. App. 406, 410 (1) (546 SE2d 819) (2001) (punctuation and footnote omitted).

caseworker conceded that the three-month window had not afforded the father adequate opportunity to complete the expected goal concerning an anticipated drug assessment followed by a likely 12-week substance abuse program. What is more, the juvenile court's order included additional goals that could not be met while the father was incarcerated – e.g., "obtain/maintain stable income sufficient to meet the needs of the family" and "obtain/maintain stable housing with sufficient space to meet the needs of the family." Without question, the guardian ad litem's concerns and opinion expressed at the termination hearing find substantial support in the record.[22]

"Aggravating circumstances may also include 'a history of incarcerations for repeated criminal offenses and a determination that it is likely such criminal activity will continue upon release.'"[23] For example, "repeated incarceration preventing one from caring for a child indicates a likelihood of continued deprivation."[24] Here, DFCS adduced evidence of the father's four convictions. Two of the crimes were committed

---

[22] See generally id. at 410-411 (1) (expressing concern that juvenile court permanently terminated the father's parental rights, where juvenile court disregarded DFCS's failure to formulate case plan aimed at reunifying the father with the child).

[23] *In the Interest of J. D. F.,* supra at 428, quoting *In the Interest of M. C. L.*, supra at 134-135 (1) (a).

[24] *In the Interest of M. C. L.*, supra (punctuation and footnote omitted).

21

years before T. Z. L. was born; neither those two nor the third conviction (in 2011) involved a lengthy period of confinement. The father was convicted a fourth time (receiving a four-year sentence in January 2012 ). "Although the [juvenile] court made a finding that the deprivation would continue due to the father's current incarceration, it did not find it likely that the father would engage in criminal activity upon his release."[25]

In terminating the father's parental rights, the juvenile court took into account that the father would "remain incarcerated at least six to eight months more," and the court reasoned that, once released, the father would then have to establish "stability in his life such as to render him fit to parent the child," during which time the child would potentially remain in foster care. "But this is not a case where the father's release date is many years away."[26] Moreover, there was testimony that T. Z. L. was

---

[25] *In the Interest of J. D. F.*, supra. Compare, e.g., *In the Interest of M. C. L.*, supra (finding that a long history of incarceration, coupled with misconduct that continued even after DFCS took custody of the children, showed that the past conduct was likely to continue); *In the Interest of J. E.*, 309 Ga. App. 51, 56-57 (1) (c) (711 SE2d 5) (2011) (finding evidence sufficient to show that deprivation was likely to continue, where parent never paid child support, never had stable housing or employment, and used cocaine every day in the months preceding the hearing).

[26] Compare *In the Interest of J. D. F.*, supra at 425-429 (1) (reversing termination in case where, inter alia, father's scheduled release date was three years after the children were placed in DFCS's custody ), with *In the Interest of D.M.W.*,

doing well in foster care. There was no evidence, however, that any foster parent stood ready and willing to adopt him.[27]

In its termination order, the juvenile court also found that "[t]he father suffered a head injury several years ago which has apparently rendered him unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." In so finding, the court cited OCGA § 15-11-94 (b) (4) (B) (i), but that Code provision expressly contemplates a "medically verifiable deficiency" of the parent's physical, mental, or emotional health of such duration or nature as to "render the parent unable to provide adequately" for the child's needs. The juvenile court relied on the therapist's testimony, but that witness merely relayed that the father had mentioned during their interview that, years earlier, he had been in a serious automobile accident. Neither the therapist's nor any other witness's testimony, or any

---

supra at 460 (3) (affirming termination upon evidence, inter alia, that mother was incarcerated when the child was six months old and the child would be twelve years old upon her release) and *In the Interest of A.T.H.*, 248 Ga. App. 570, 573 (1) (547 SE2d 299) (2001) (affirming termination upon evidence, inter alia, that parent was serving two life sentences and would not be eligible for parole until her two children, who had already been in foster care for most of their lives, were fourteen and fifteen years old).

[27] Cf. *In the Interest of D.M.W.*, supra (foster parents stood ready to adopt child upon termination of his parents' rights).

23

evidence of record, amounted to a "competent opinion as to the [father's] mental health or how a deficiency therein affected [his] ability to care for [T. Z. L.]."[28]

In *In the Interest of J. D. F.*,[29] we reversed the termination of a father's parental rights where the evidence was insufficient to establish that the past deprivation was likely to continue.[30] In that case, the children were adjudicated deprived in 2003,[31] at a time when the father was incarcerated.[32] Goals for the father imposed by a court-ordered case plan included maintaining a source of income for the children, maintaining appropriate housing, completing a drug and alcohol treatment

---

[28] *In the Interest of A. M.*, 306 Ga. App. 358, 362 (5) (702 SE2d 686) (2010) (citation omitted); cf. *In the Interest of J. S. B.*, 277 Ga. App. 660, 662 (2) (b) (i) (627 SE2d 402) (2006) (finding that medically verifiable mental deficiency rendered a mother unable to provide for her children's needs, where mother was diagnosed with antisocial personality disorder, anger control problems, and mild mental retardation, where she consistently neglected to take medication prescribed to treat her mental health condition, and where as a result, she had difficulties understanding parenting concepts, as well as communicating with her children, and which circumstances led to mother's inability to promptly seek medical treatment for one child's broken leg).

[29] Supra.

[30] Id. at 429 (1).

[31] In December 2002, DFCS had opened a case on the family due to neglect and inadequate housing; during an announced home visit in April 2003, DFCS found the home dirty and roach-infested, and the mother's whereabout were unknown. Id. at 425.

[32] Id. at 424-425.

program, and attending parenting classes.[33] The juvenile court banned visitation between the father and the children.[34] In 2004, a citizen review panel recommended that the father's rights be terminated, as he remained incarcerated.[35] Later that year, DFCS petitioned for termination of the father's parental rights.[36]

In that case, a termination hearing was held in March 2005.[37] Evidence showed that the father, who was still incarcerated, had meanwhile sent the children over 40 letters, as well as other small gifts.[38] According to a DFCS caseworker, the letters showed that the father's ability to communicate with the children was "beyond above average."[39] Further, the DFCS caseworker acknowledged that it was difficult for the father to complete the case plan in prison and that she did not know what classes were

---

[33] Id. at 425-426 (1).

[34] Id. at 426 (1).

[35] Id.

[36] Id.

[37] Id.

[38] Id.

[39] Id. at 428 (1).

25

offered in prison that might have met the requirements set forth in the plan.[40]

Notwithstanding, the father submitted documentation at the hearing that he had completed several classes available to him in prison and that he was then enrolled in a family violence class, which he understood was similar to a parenting skills class.[41] Evidence showed that the father was scheduled to be released in December 2006.[42] Although the father had two prior convictions, they were before his children were born and did not involve lengthy periods of incarceration; moreover, the juvenile court did not find it likely that the father would engage in criminal activity upon his release.[43] DFCS focused on the fact that the father was still incarcerated and that it would take time for him to complete a case plan once he was released, during which time the children would remain in foster care.[44] There was evidence that the children were doing well in foster care; there was no evidence, however, that the foster parents

---

[40] Id.

[41] Id. at 426.

[42] Id.

[43] Id. at 428 (1).

[44] Id.

were ready or willing to adopt the children.[45] Under those circumstances, we concluded that there was not clear and convincing evidence that the children's deprivation by the father was likely to continue, "[a]bsent aggravating circumstances, and given the father's efforts while incarcerated to complete a case plan clearly not designed for him and his scheduled release date of December 2006."[46]

"Although we are reluctant to reverse a trial court's determination, there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously."[47] Here, we conclude that there was not clear and

---

[45] Id.

[46] Id. at 429 (1).

[47] *In the Interest of R. C. M.*, 284 Ga. App. 791, 800 (III) (3) (645 SE2d 363) (2007) (citations and punctuation omitted); see *In the Interest of D. N. K.*, 282 Ga. App. 430, 431 (638 SE2d 861) (2006) (explaining that, because of the "high value society places on the integrity of the family unit[,] . . . [o]nly under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship").

27

convincing evidence that deprivation by T. Z. L.'s father was likely to continue.[48]

Termination of his parental rights was therefore error, and the judgment is reversed.[49]

---

[48] See *In the Interest of R. C. M.*, supra at 799-800 (III) (3) (concluding that there was not clear and convincing evidence that the deprivation caused by the father was likely to continue, where DFCS adopted a reunification plan for the father with goals which it knew the father could not achieve while incarcerated, the juvenile court repeatedly told the father to contact a caseworker after incarceration to begin work on the case plan, yet DFCS petitioned to terminate parental rights while the father was incarcerated, and the juvenile court severed the parent-child relationship based on father's previous incarceration and his failure to achieve his reunification case plan goals within 45 days of freedom); *In the Interest of J. D. F.*, supra at 427-729 (1); *In the Interest of B. N. A.*, supra at 410-411 (1) (reversing termination of father's parental rights, where father had no opportunity to comply with a reunification plan because DFCS never established a plan as court-ordered and only six months elapsed between time juvenile court entered its order requiring the plan and time of the termination hearing; father's previous drug offense conviction, current criminal charges, and lack of greater initiative in reuniting himself with his child was not clear and convincing evidence that his lack of proper parental care or control was causing, and would continue to cause, his child's deprivation); *In the Interest of K. J.*, 226 Ga. App. 303, 305-306 (1), 307-308 (2) (486 SE2d 899) (1997) (reversing termination of mother's parental rights where hearing was held less than four months after the mother was released from prison, although the reunification case plan relied upon by the court required the mother to obtain employment within six months of her release; and reversing termination of father's parental rights where there was evidence that the father and child had a positive relationship, to the extent permitted by the father's incarceration, and there was no evidence presented at the hearing that the child was likely to suffer serious harm absent a termination of parental rights).

[49] See *In the Interest of R. C. M.*, supra; *In the Interest of J. D. F.*, supra at 429 (1).

In view of the foregoing, we vacate the June 5, 2012 "Supplemental Order Incorporating a Case Plan," which plan was for *non-reunification* and required the father to meet goals he plainly could not achieve while incarcerated.[50] This case is remanded "for the establishment of a reunification plan for the father, subject to whatever disposition is warranted by future events and those occurring since the termination hearing."[51]

(b) As set forth above, the father challenges also the sufficiency of the evidence to support the requisite findings that continued deprivation would cause or likely cause harm to the child[52] and that termination of his parental rights was in T. Z. L.'s best interest.[53]

> Because [DFCS] failed to carry its burden of proving by clear and convincing evidence that the [child's] deprivation stemming from the father's misconduct or inability [was] likely to continue, we do not reach the issue of whether continued deprivation is likely to harm the child[].

---

[50] See *In the Interest of R. C. M.*, supra; *In the Interest of B. N. A.*, supra.

[51] *In the Interest of J. D. F.*, supra at 429 (1) (footnote omitted); see *In the Interest of C. S.*, supra at 148 (1) and cits.; *In the Interest of K. M.*, supra at 681.

[52] OCGA § 15-11-94 (b) (4) (A) (iv).

[53] OCGA § 15-11-94 (a).

29

Similarly, it is premature to consider whether termination of parental rights was in the [child's] best interests.[54]

Therefore, we vacate the August 21, 2012 "Supplemental Order Following Citizen Panel Review and Permanency Hearing Order," wherein the juvenile court stated that neither parent had attended the panel review meeting, then ruled, "[u]pon review of the recommendations of the [Citizen] Panel," that "adoption" (as opposed to "reunification") was in the best interest of the child and was the "Permanency plan." As shown on the face of the termination order, the juvenile court concluded that the father was bound by those determinations for purposes of terminating his parental rights under OCGA § 15-11-94 – even though those findings were made *before* any termination hearing took place.[55]

---

[54] *In the Interest of R. C. M.*, supra at 800 (III) (3) (citations omitted); see *In the Interest of C. S.*, supra ("Because we have found the evidence does not support a determination that the deprivation is likely to continue, we need not consider whether the children were being harmed by the deprivation and do not reach the second stage of the inquiry concerning the best interests of the children.").

[55] See, however, *In the Interest of J. H.*, 273 Ga. App. 424, 426 (615 SE2d 231) (2005) ("Due process requires that, prior to the termination of his parental rights, the father receive notice and an opportunity to be heard.") (punctuation and footnote omitted); see also *In the Interest of B. R.*, 277 Ga. App. 833, 835-836, n. 2 (627 SE2d 879) (2006) (noting principle that, to take judicial notice of prior order, judge is required to announce on the record intention to do so and give parent an opportunity to be heard).

The *recommendations* of a "citizens review panel" can be afforded no legal weight by the trial court as a substitute for the court's own findings of fact in compliance with OCGA § 15-11-[94]. The citizen's review panel's findings of fact and recommendations are not legal evidence as the panel is not a court of record and its actions are not necessarily in compliance with regard to legal due process considerations. The court of record in these cases is the juvenile court, and its findings must be based on legal evidence and constitutional considerations.[56]

"[A] juvenile court is required in termination proceedings to follow strictly the provisions of [OCGA § 15-11-94] and to make the determinations therein required. In reaching its determinations a juvenile court must be protective of the constitutional rights of both parent and child."[57] "Due process under the Fourteenth Amendment requires that 'before a state may sever the rights of a parent in his natural child, the

---

[56] *In the Interest of M. L. P.*, 231 Ga. App. 223, 224 (498 SE2d 786) (1998) (citation omitted; emphasis in original). The case of *In the Interest of M. L. P.* was decided under OCGA § 15-11-81, which statute was subsequently redesignated as the current OCGA § 15-11-94. See Ga. L. 2000, p. 20, § 1; *In the Interest of J. R.*, 274 Ga. App. 653, 656 (1), n. 7 (618 SE2d 668) (2005).

[57] *In the Interest of J. E. E.*, 228 Ga. App. 831, 835 (2) (493 SE2d 34) (1997) (citation omitted).

state must support its allegations of the parental's unfitness by at least clear and convincing evidence.'"[58]

2. Based on our rulings in Division 1,[59] we need not address the father's remaining arguments concerning violation of his due process rights.[60]

*Judgment reversed and case remanded with direction. Ellington, P. J., and Branch, J., concur.*

---

[58] *In the Interest of B. N. A.*, supra at 407 (1), quoting *Thorne v. Padgett*, 259 Ga. 650, 651 (386 SE2d 155) (1989).

[59] Supra.

[60] See generally *In the Interest of J. D. F.*, supra at 429 (2).